## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| ANTONIO MCDOWELL | ) | |
| | ) | |
| *Plaintiff,* | ) | Case No. |
| | ) | |
| v. | ) | |
| | ) | |
| REYNALDO GUEVARA, BERNARD | ) | |
| BRENNAN, RICHARD MAHER, DANIEL | ) | |
| ENGEL, HECTOR VERGARA, ALAN | ) | |
| PERGANDE, JAMES GILGER, RANDY | ) | |
| TROCHE, GERI LYNN YANOW as special | ) | |
| representative for the ESTATE OF ERNEST | ) | |
| HALVORSEN, EDWARD MINGEY, | ) | |
| ROBERT BIEBEL, PHILIP J. CLINE, and | ) | |
| the CITY OF CHICAGO. | ) | |
| | ) | |
| *Defendants.* | ) | **JURY TRIAL DEMANDED** |
| | ) | |

## COMPLAINT

NOW COMES Plaintiff, ANTONIO MCDOWELL, by his attorneys LOEVY & LOEVY, and complaining of Defendants REYNALDO GUEVARA, BERNARD BRENNAN, RICHARD MAHER, DANIEL ENGEL, HECTOR VERGARA, ALAN PERGANDE, JAMES GILGER, RANDY TROCHE, GERI LYNN YANOW as special representative of the ESTATE OF ERNEST HALVORSEN, EDWARD MINGEY, ROBERT BIEBEL, PHILIP J. CLINE, and the CITY OF CHICAGO, states as follows:

### INTRODUCTION

1.      Plaintiff Antonio McDowell was only 19 years old when notorious Chicago Police Detectives Reynaldo Guevara, Ernest Halvorsen, and their co-conspirators at the Chicago Police Department framed him for a 1996 murder and carjacking he did not commit.

2.      Plaintiff was wrongly convicted and spent almost 23 years in prison.

3.      He has spent over half of his life fighting to prove his innocence, which he has maintained from the very beginning.

4.      Plaintiff had nothing to do with the 1996 crimes. Not one piece of physical evidence ever connected Plaintiff to them, and Defendants had no reason to think he was responsible.

5.      Indeed, the physical evidence in the case ruled out Plaintiff and implicated a different perpetrator.

6.      Plaintiff's arrest, prosecution, and conviction were based entirely on false evidence knowingly manufactured by Defendants, including false eyewitness identifications.

7.      Defendants also framed Plaintiff by suppressing evidence of his innocence, including evidence that pointed to the true perpetrator.

8.      The Defendants' misconduct resulting in Plaintiff's wrongful conviction was part of a now well-known pattern of illegal activity perpetrated by Defendant Guevara and the other Defendants.

9.      Plaintiff is one of at least 51 people who have had convictions on murder charges thrown out after being framed in corrupt homicide investigations conducted by Chicago Police officers, including Defendant Guevara, whom the Illinois Appellate Court has called "a malignant blight on the Chicago Police Department and the judicial system."

10.     Cook County courts have found that "Detective Guevara engaged in a pattern and practice of intimidating, threatening, and influencing witnesses in prior homicide investigations," and that Defendant Guevara told "bald-faced lies" during court testimony and had "eliminated any possibility of [] being considered a credible witness in any proceeding."

11.     In court proceedings, Defendant Guevara and his associates have pleaded their Fifth Amendment rights not to incriminate themselves in response to questions about their misconduct

as police officers. When asked specifically about investigatory misconduct and knowledge of Plaintiff's innocence—including questions about whether Defendants knowingly fabricated the only evidence used to convict Plaintiff—Defendant Guevara invoked his Fifth Amendment right to remain silent, for fear that he might incriminate himself.

12.     Nearly three decades after Plaintiff's arrest, after Guevara's misconduct came to light, DNA evidence demonstrated Plaintiff's long-asserted innocence. A state court vacated his conviction, and state prosecutors dropped all charges against him.

13.     Plaintiff now seeks justice for the harm that the Defendants have caused him and redress for the loss of his liberty and profound hardship he endured and continues to suffer because of the Defendants' misconduct.

## JURISDICTION AND VENUE

14.     Plaintiff brings this action under 42 U.S.C. § 1983 Illinois law to redress the Defendants' tortious conduct and their deprivation of his rights secured by the U.S. Constitution.

15.     This Court has jurisdiction over Plaintiff's federal claims under 28 U.S.C. § 1331 and supplemental jurisdiction over his state-law claims under 28 U.S.C. § 1367.

16.     Venue is proper under 28 U.S.C. § 1391(b) because Plaintiff lives in this judicial district and the events and omissions giving rise to his claims, including the investigation, prosecution, and trial resulting in Plaintiff's conviction, happened here.

## PARTIES

17.     Plaintiff Antonio McDowell lives in Chicago, Illinois. He spent more than 23 years wrongfully incarcerated for murder, attempted murder, and aggravated carjacking—crimes he did not commit.

18.     At all relevant times, Defendants Reynaldo Guevara, Bernard Brennan, Richard Maher, Daniel Engel, Hector Vergara, Alan Pergande, James Gilger, Randy Troche, Ernest Halvorsen, Edward Mingey, Robert Biebel, and Philip J. Cline were officers at the Chicago Police Department acting under color of law and within the scope of their employment for the City of Chicago. Plaintiff sues each of these defendants in his individual capacity.

19.     Geri Lynn Yanow, the Special Representative for Ernest Halvorsen, deceased, is named as a Defendant in her capacity as Special Representative of Ernest Halvorsen, as successor in interest and to defend this action on behalf of Defendant Ernest Halvorsen.

20.     At all relevant times, Edward Mingey, Robert Biebel, and Philip J. Cline supervised Defendant Police Officers. Defendants Mingey, Biebel, and Cline participated in the misconduct alleged in this complaint and facilitated, condoned, approved, and turned a blind eye to Defendants' misconduct.

21.     The City of Chicago is an Illinois municipal corporation that employs or employed the above-named Defendants. At all relevant times, each individual Defendant acted as an agent or employee of the City of Chicago.

## FACTS

### Mario Castro Is Murdered and Ruth Morales-Santana Is Robbed

22.     Around 3:00 PM on December 21, 1996, Mario Castro was shot and killed just after he exited his car upon arriving home in the Humboldt Park neighborhood. Castro lived in an apartment on the second floor of his building with his nephew, Alberto Varela, among others.

23.     Castro had returned home from the store and was exiting his car in the garage behind his home when he was confronted by the shooter.

24.     Castro's family and neighbors at and near his house at the time heard screams and gunshots.

25.     No one witnessed the shooting.

26.     Upon hearing screams, Castro's nephew Varela ran outside and observed the perpetrator searching Castro's pockets as he lay on the ground.

27.     Varela approached the perpetrator. After an altercation, the perpetrator ran away out the back and down the alley. As Varela chased him, the perpetrator fired several shots that missed. Varela gave up the chase.

28.     Castro's brother-in-law, Juan Medina, also heard the gunshots from his second-floor porch and reported seeing the perpetrator going through the victim's pockets.

29.     Castro was transported to Mount Sinai Hospital by ambulance where he was pronounced dead on arrival.

30.     A short time later and just a few blocks away, the perpetrator stole Ruth Morales-Santana's car at gunpoint and fled in Morales-Santana's car.

31.     The stolen car was later found discarded on the street near 1713 North Luna Avenue, with the keys still in the ignition.

32.     The Chicago Police Department responded to the scene of the crimes.

33.     Detectives from the Area Five Violent Crimes Division, including Defendants Halvorsen, Guevara, Engel, Vergara, Pergande, and Troche were assigned to the investigation.

34.     Defendant Sergeants Biebel and Mingey were assigned to supervise the investigation. Defendant Cline, as the Commander of Area Five, oversaw the sergeants and detectives assigned to the investigation.

**Defendants' Investigation Reveals Witnesses Could Not Describe or Identify the Shooter**

35.     When potential eyewitnesses—Alberto Varela, Ruth Morales-Santana, and Juan Medina—were interviewed by officers and detectives in the hours after the shooting and carjacking, they described little about the perpetrator.

36.     Varela and Morales-Santana could provide only vague descriptions of the perpetrator, such as general descriptions of height and weight, that the perpetrator was a Black man with medium complexion, and that the perpetrator wore a Nike brand hat and jacket.

37.     Neither Varela nor Morales-Santana could identify any distinguishing characteristics or facial features of the perpetrator.

38.     Juan Medina could give no description of the perpetrator at all. Despite knowing that Medina was unable to describe the shooter, Defendants falsely reported that Medina "would be able to identify the Offender if he sees him again."

39.     Defendants took Varela and Morales-Santana to Area Five where they reviewed photo books in an attempt to identify a suspect. Plaintiff's photo was among those reviewed by Varela and Morales-Santana, but neither witness could make an identification.

40.     Because the witnesses were unable to make an identification, the Defendants created a composite sketch of the perpetrator based on the information they did provide.

41. Defendants also instructed detectives to canvas the 1700 block of North Luna, where the stolen car had been found.

42. Based on physical evidence and witnesses' accounts, Detectives concluded that a single individual had shot Castro, fled on foot, stolen Morales-Santana's car as a getaway car, driven away, and later abandoned the car. They also concluded that the perpetrator likely lived near where the car had been discarded.

43. Defendants showed witnesses the composite sketch and contemporaneously noted that "Hopefully someone in the 'Hood' will recognize the offender."

44. Yet Defendants' investigative file lacks any record of the Defendants canvassing the neighborhood to see if anyone recognized the person in the composite—or doing any investigative work in this case—for roughly seven months.

45. There were no leads until July 1997.

**Seven Months After the Crime, Plaintiff Is Shot in an Unrelated Incident and Refuses to Cooperate in Defendants' Plan to Frame Another Man in the Shooting**

46. On July 10, 1997, almost seven months after the Castro shooting, Plaintiff was the victim of a drive-by shooting on the 4800 block of West Van Buren Street.

47. While in the hospital, Plaintiff told police he had not seen the face of the person who shot him. Police gave him a copy of a case report and told him to expect a follow-up.

48. A short time later, the Defendants found Plaintiff on the street and brought him to the police station.

49. The Defendants told Plaintiff they wanted him to come to the Area Five police station because they had a lead as to who shot him.

50. After arriving at Area Five, the Defendants showed Plaintiff a photo book and told him it contained a photo of the suspect in his case. When Plaintiff repeated again that he had not

seen the person who shot him, Defendants handed Plaintiff four individual photos and asked him whether any of them showed his shooter.

51.     Despite Plaintiff's adamant assertions that he could not make an identification, Defendant Guevara pointed to a Latino man in one of the individual photos and instructed Plaintiff to falsely implicate him as the person who shot him.

52.     When Plaintiff resisted participating in the Defendants' efforts to frame their chosen target, Defendant Guevara grew agitated and increasingly aggressive.

53.     Defendant Guevara cuffed Plaintiff's hand, which was still healing from being shot just days prior, to a wall in a small interrogation room. Defendant Guevara left Plaintiff in the interrogation room for hours, coming in and out several times to ask if Plaintiff was ready to falsely identify Defendant Guevara's target.

54.     Plaintiff continually refused and begged to leave. But Defendant Guevara told him that he would need to wait.

55.     The Defendants intentionally ignored Plaintiff's pleas for medical care and his complaints of pain to his wrists and left hand where he had been shot so that he would be increasingly vulnerable to the Defendants' threats.

56.     Defendants Guevara and Halvorsen's conduct was part of a now well-known pattern of illegal activity that included framing dozens of innocent people they wished to take down.

### The Defendants Knowingly Fabricate Photo Identifications to Falsely Implicate Plaintiff in the December Murder and Carjacking

57.     After Plaintiff refused to help frame another man, he suddenly became Defendants' target in the Castro shooting.

58.     The Defendants brought Juan Medina—one of the scene witnesses to the Castro murder and carjacking—to Area Five for a photo identification procedure.

59.     The Defendants never offered an explanation as to how or why they suddenly thought to show Medina new photos seven months after the murder, or why Defendants believed that the offender would be contained in this specific array out of all the photobooks that detectives had access to.

60.     Additionally, Defendants never explained how Plaintiff suddenly became a suspect in the crimes that had occurred on December 21, 1996.

61.     This is because the only reason he had become a suspect was that he had refused to cooperate in Defendants' efforts to frame another man in the shooting of Plaintiff.

62.     Given that Medina could not give the Defendants a description of the shooter on the day of the Castro murder, the Defendants knew he would be similarly unable to do so seven months later.

63.     Knowing that Medina could not identify the shooter, Defendant Guevara showed him a photo of Plaintiff and instructed him to falsely identify Plaintiff as the perpetrator.

64.     Defendant Guevara knowingly manufactured Medina's false photo identification and knowingly fabricated an accompanying false police report.

65.     The Defendants then went to the homes of Varela and Morales-Santana. Defendants Guevara and Halvorsen knew that the few details Varela and Morales-Santana had been able to give detectives about the perpetrator at the time of the crime did not match Plaintiff.

66.     For example, both described the perpetrator as having a medium complexion, and Plaintiff had a clearly dark complexion.

67.     For another, Morales-Santana described the perpetrator as roughly 28 years old. Antonio was barely 19 when the crimes occurred.

68.     Despite knowing Plaintiff had nothing to do with the Castro murder and carjacking, Defendants Guevara and Halvorsen coerced Varela and Morales-Santana to falsely identify a photo of Plaintiff as the perpetrator.

**The Defendants Knowingly Fabricate False Lineup Identifications to Frame Plaintiff**

69.     The Defendants then brought Medina, Varela, and Morales-Santana to the Area Five Police Station.

70.     When Medina, Varela, and Morales-Santana arrived, the Defendants had the witnesses look through the window of Plaintiff's interrogation room. Despite knowing that there was no evidence linking Plaintiff to the Castro murder and carjacking, the Defendants once again instructed the witnesses to identify Plaintiff—the person they were shown in the interrogation room—as the perpetrator when the live lineup took place.

71.     Defendant Guevara repeatedly returned to Plaintiff's interrogation room to ask him if he was ready to falsely identify Defendants' suspect as the person who shot him.

72.     Plaintiff, despite his fear and confusion, continued to refuse to falsely implicate the Latino man whom Defendant Guevara continued to pressure him to pick.

73.     The Defendants then placed Plaintiff in live lineups and instructed Varela, Medina, and Morales-Santana—despite knowing their initial descriptions did not match Plaintiff and that Plaintiff had no connection to the crimes in this case—to falsely pick Plaintiff as the perpetrator of the December shooting and carjacking.

74. The Defendants then fabricated reports falsely claiming that Varela, Medina, and Morales-Santana had legitimately identified Plaintiff as the person who killed Castro and stole Morales-Santana's car.

75. Supervising Defendants Mingey, Biebel, and Cline knew that the Detective Defendants had coerced and fabricated the false identifications of Plaintiff made by Varela, Medina, and Morales-Santana despite the witnesses' protestations that they could not make an identification. Nonetheless, the supervising Defendants approved the false police reports—knowing their falsity.

76. Following the line-up, Defendant Guevara tried to extract a false confession from Plaintiff. Plaintiff refused and denied any knowledge of the crimes that Guevara accused him of.

77. Defendant Guevara told Plaintiff that because he had refused to help the Defendants plant a case on the man they wanted to take down, it was Plaintiff who would be going to prison for the rest of his life.

**After Knowingly Manufacturing False Witness Identifications of Plaintiff, the Defendants Suppress Evidence of Plaintiff's Innocence**

78. Until the Defendants decided to falsely pin the Castro murder and carjacking on Plaintiff, the information gathered by detectives pointed to a different suspect.

79. After the Defendants decided to frame Plaintiff seven months after the crime, the Defendants suppressed all material exculpatory and impeaching evidence.

80. Varela and Morales-Santana were shown photo books on the day of the crime and neither witness could make an identification. The photo books contained a photo of Plaintiff, meaning that in Varela and Morales-Santana's first attempt to identify the perpetrator, they saw Plaintiff's photo and did not identify him.

81.     After selecting Plaintiff as their target seven months after the crime, the Defendants suppressed the initial negative identifications, as well as the photobooks on which those negative identifications were based.

82.     The initial negative identifications and photobooks were both exculpatory and impeaching to the later knowingly fabricated identifications.

83.     Similarly, during the initial police investigation, detectives concluded the perpetrator must have lived near where the carjacked car had been abandoned.

84.     Later in their investigation, after Plaintiff became the Defendants' target, they learned that Plaintiff did not live near the location of the abandoned getaway car, so they suppressed evidence showing that they believed the perpetrator lived in the vicinity of the discarded car. They also suppressed all information related to their investigation between December 1996 and July 1997, including in the neighborhood where the car was abandoned.

85.     During the initial investigation, police had created a composite sketch of the perpetrator. The police composite sketch did not match Plaintiff, so after the Defendants knowingly manufactured evidence against him they suppressed the exculpatory composite sketch.

86.     Defendants never turned the composite sketch over to the State's Attorney's Office or to Plaintiff's trial counsel.

87.     To this day, the composite sketch has never been produced and appears nowhere in the homicide file.

**Plaintiff's Wrongful Conviction and Imprisonment**

88.     Plaintiff has maintained his innocence throughout the entirety of his case.

89.    As a result of Defendants' misconduct and based on the false evidence they knowingly manufactured, Defendants caused Plaintiff to be prosecuted and convicted for the murder of Mario Castro and the aggravated vehicular carjacking of Ruth Morales-Santana.

90.    No weapon or other physical or forensic evidence connected Plaintiff to either crime—and Defendants knew this.

91.    At trial, the State's case hinged entirely on the Defendants' knowingly fabricated false identifications.

92.    The Defendants suppressed all evidence that implicated a different perpetrator—including the initial witness descriptions that did not match Plaintiff, the police composite sketch that did not match Plaintiff, Varela and Morales-Santana's first negative identification of Plaintiff, the photobooks Varela and Morales-Santana viewed in making those negative identifications, evidence the Defendants collected showing the true perpetrator lived many miles from where Plaintiff lived, and all documentation of their investigation between December 1996 and July 1997—ensuring Plaintiff's wrongful conviction.

93.    Plaintiff was found guilty of first-degree murder, attempted murder, and aggravated vehicular hijacking.

94.    At Plaintiff's sentencing—a time when people are incentivized to show remorse and ask for forgiveness to avoid harsh sentences—Plaintiff stood by the truth of his innocence:

> I'm sorry to whatever happened to that man, but I didn't kill him. I was framed. Police know they framed me. Because when they arrested me I was a victim. I got to speak. You all know I was a victim. I was a victim. I got shot at [a] driveby. When they arrested me I was the victim. They placed me in the lineup. I am talking about I ain't have no knowledge of [] Castro, his family. I didn't murder him. Putting me under the jail [is] not going to make the family happy. Because the killer is still at large. You all, I mean I can't, I don't even know what to say. I know I didn't kill that man. That is not my MO. That is all I have to say.

95.    On April 26, 1999, the Court sentenced Plaintiff to 103 years in prison.

96.     Without Defendants' intentional fabrication and suppression of material exculpatory and impeaching evidence, Plaintiff would never have been convicted.

97.     Plaintiff was just 21 years old when the Defendants framed him. The following decades of his life were consumed by the horror of wrongful imprisonment.

98.     Because of the Defendants' misconduct, Plaintiff's opportunity to grow older with his family and make a life with them was taken away. Plaintiff's relationship with his family and friends was severely harmed.

99.     Plaintiff was stripped of his young adulthood, much of his full adulthood, and deprived of opportunities to gain an education, to engage in meaningful labor, to develop skills and a career, and to pursue his interests and passions.

100.    The Defendants' misconduct deprived Plaintiff of all the basic pleasures of human experience, which all free people enjoy as a matter of right, including the freedom to live one's life as an autonomous human being.

101.    Plaintiff never knew whether the truth would come out or whether he would ever be exonerated for crimes he had not committed.

102.    Plaintiff spent almost 23 years in prison and has spent well over half his life trying to clear his name.

103.    In addition to the severe trauma of wrongful imprisonment and Plaintiff's loss of liberty, the Defendants' misconduct continues to cause Plaintiff extreme physical and psychological pain and suffering, humiliation, constant fear, anxiety, deep depression, rage, and other physical and psychological effects.

104.    Plaintiff was branded a murderer—causing him to suffer profound reputational harm as a result.

**Plaintiff's Exoneration**

105.   Plaintiff steadfastly proclaimed his innocence throughout the entire 23 years he was incarcerated and the time he has spent since then fighting the false charges against him.

106.   Plaintiff has always maintained that he was framed by Defendants. His contemporaneous outcry that he was being framed is now corroborated as a pattern of misconduct by Defendants.

107.   As the extent of Defendant Guevara's rampant corruption began coming to light, Plaintiff filed a petition for relief from the criminal court's judgment and to vacate his convictions.

108.   During the post-conviction proceedings, the Cook County State's Attorney's Office asked Plaintiff to consent to DNA testing.

109.   The person who murdered Castro left touch DNA on Castro's pants when rummaging through Castro's body and clothing.

110.   The DNA left on the victim was collected at the time of the crime in 1996 and preserved.

111.   When the State's Attorney's Office asked Plaintiff to consent to testing his DNA against the perpetrator's DNA left on Castro's clothing, Plaintiff enthusiastically agreed and voluntarily gave a buccal swab the same day.

112.   The perpetrator's DNA did not match Plaintiff and wholly excluded him as the killer.

113.   Following agreement by the State's Attorney's Office and an evidentiary hearing, the Cook County Circuit Court vacated Plaintiff's convictions

114.   The State dismissed all charges against Plaintiff.

115. At the time of his exoneration, Plaintiff had been fighting the false charges against him for more than half of his life.

### Chicago's Policy and Practice of Wrongly Convicting Innocent People in Violation of the Constitution

116. The City of Chicago and the Chicago Police Department are responsible, by virtue of their official policies, for inflicting miscarriages of justice in scores of criminal cases like the one endured by Plaintiff.

117. Since the 1980s, no fewer than 100 cases have come to light in which Chicago police officers fabricated false evidence and/or suppressed exculpatory evidence to cause the convictions of innocent people for serious crimes they did not commit.

118. These cases include many in which Chicago police officers used the same tactics Defendants employed against Plaintiff in this case, including but not limited to fabricating evidence, concealing exculpatory evidence, coercing confessions and statements through physical and psychological abuse, manipulating witnesses to influence eyewitness identifications and testimony, and using other tactics to secure the arrest, prosecution, and conviction of a person without probable cause or regard for the person's actual guilt.

119. At all relevant times, members of the Chicago Police Department, including Defendants in this action, routinely fabricated and manipulated identification procedures to procure suspect identifications they knew to be inaccurate.

120. At all relevant times, members of the Chicago Police Department, including the Defendants in this action, systematically suppressed exculpatory and/or impeaching material by intentionally secreting discoverable reports, memos, and other information. This concealed material was kept in files that were maintained only at the Chicago Police Department and never disclosed to criminal defendants, their attorneys, or state prosecutors. As a matter of widespread

16

custom and practice, these clandestine files were withheld from the State's Attorney's Office and from criminal defendants, and they were routinely destroyed or hidden at the close of the investigation rather than being preserved as part of the official file.

121. Consistent with the municipal policy and practice described in the preceding paragraph, employees of the City of Chicago, including Defendants, concealed exculpatory evidence from Plaintiff.

122. The existence of this policy and practice of suppressing exculpatory and/or impeaching material in clandestine files was established and corroborated in the cases of *Rivera v. Guevara*, No. 12-cv-4428 (N.D. Ill.), *Fields v. City of Chicago*, No. 10-cv-1168 (N.D. Ill.), and *Jones v. City of Chicago*, No. 87-cv-2536 (N.D. Ill.), among others.

123. The policies and practices of file suppression exposed in Fields were in place from the 1980s through the 2000s, including at the time of the investigation at issue here.

124. In addition, a set of clandestine files related to Area 5 homicides—the same detective division involved in this case—was found in the case of *Rivera v. Guevara*, No. 12-cv-4428 (N.D. Ill.). Those files, for a period in the 1980s and 1990s, contained exculpatory and impeaching evidence not turned over to criminal defendants.

125. The policy and practice of suppressing exculpatory and/or impeaching material evidence was alive and well at all relevant times, including at the Area Five Detective Division during the investigation at issue here.

126. The City of Chicago and the Chicago Police Department also routinely used illegal tactics, including torture, physical coercion, and psychological coercion, to extract involuntary and false confessions and statements from suspects and witnesses. There are over 250 documented cases of Chicago police officers using torture and coercion to illegally obtain confessions in

homicide cases. The City had notice of this widespread practice of procuring false and coerced confessions long before the events at issue in this case.

127.    Moreover, the City of Chicago and the Chicago Police Department routinely failed to investigate cases where Chicago police detectives recommended charging an innocent person with a serious crime. No Chicago police officer has ever been disciplined for misconduct in any of those cases.

128.    Prior to and during the period in which Plaintiff was falsely charged and convicted, the City of Chicago also operated a dysfunctional disciplinary system for Chicago police officers accused of serious misconduct. The City almost never imposed significant discipline against officers accused of violating the civil and constitutional rights of members of the public. Further, the disciplinary apparatus had no mechanism for identifying police officers who were repeatedly accused of engaging in misconduct.

129.    For instance, multiple witnesses have come forward with evidence that Defendant Guevara was part of Miedzianowski's criminal enterprise. Guevara and Miedzianowski worked together in the CPD gang crimes unit before Guevara became homicide detective. Guevara used his status as a detective to advance the criminal drug enterprise he participated in with Miedzianowski and to pressure drug dealers who did not do their bidding. Guevara's assistance included working with Miedzianowski to pin murders on innocent men.

130.    In the case of *Klipfel v. Bentsen*, No. 94-cv-6415 (N.D. Ill), a federal jury in Chicago returned a verdict against the City, finding it responsible for maintaining both a code of silence and a deeply flawed disciplinary system. This system allowed Chicago police officers (operating out of the very same police facilities as Defendants in this case) to operate a far-reaching, long-running criminal enterprise that included the subversion of homicide investigations.

131.     The *Klipfel* plaintiffs were two former federal agents from the Bureau of Alcohol, Tobacco and Firearms who brought allegations of rampant criminal misconduct among gang crimes officers to the attention of CPD officials. The evidence in that litigation included: Philip Cline, an Area Commander and future Chief of Detectives and Superintendent, personally filed two Internal Affairs complaints against Miedzianowski for tampering in homicide investigations, that resulted in no discipline whatsoever; and Raymond Risley, an assistant deputy superintendent and head of Internal Affairs, not only knew about misconduct in homicide cases but actively participated in efforts to subvert the disciplinary investigation into Miedzianowski that was at the heart of the Klipfel litigation.

132.     As a matter of both policy and practice, leaders of the Chicago Police Department and elected officials in Chicago have acknowledged a code of silence within the Chicago Police Department, condoned and facilitated by municipal policy makers and department supervisors. Under the code of silence, officers refused to report and otherwise lied about their colleagues' misconduct, including the misconduct at issue in this case.

133.     As a result of the City of Chicago's established practices, officers (including Defendants here) have come to believe they may violate civilians' civil rights and cause innocent people to be charged with serious crimes without fear of adverse circumstances. The practices that enable this belief include failing to track and identify police officers repeatedly accused of serious misconduct, failing to investigate cases where police were involved in a wrongful charge or conviction, failing to discipline officers accused of serious misconduct, and facilitating a code of silence within the Chicago Police Department. As a result of these policies and practices of the City of Chicago, members of the Chicago Police Department act with impunity when they violate the constitutional and civil rights of citizens.

134.    This belief extends to the Defendants in this case. By way of example, Defendant
Guevara has a long history of engaging in the kind of investigative misconduct that occurred in
this case. There are dozens of known cases in which Guevara and other Chicago police officers
engaged in serious investigative misconduct similar to that described above. They engaged in such
misconduct because they had no reason to fear the City of Chicago and its police department would
ever discipline them for doing so.

135.    The City of Chicago and its police department also failed in the years before
Plaintiff's wrongful conviction to provide adequate training to Chicago police detectives and other
officers in many areas, including the following:

    a.    The conduct of live lineup, photographic, and other identification procedures.

    b.    The constitutional requirement to disclose exculpatory evidence, including how
to identify such evidence and how to ensure such evidence is made part of the
criminal proceeding.

    c.    The need to refrain from physical and psychological abuse, and manipulative and
coercive conduct, in relation to suspects and witnesses.

    d.    The risks of wrongful conviction and the steps police officers should take to
minimize risks.

    e.    The risks of engaging in tunnel vision during investigation.

    f.    The need for full disclosure, candor, and openness on the part of all officers who
participate in the police disciplinary process, both as witnesses and as accused
officers, and the need to report misconduct committed by fellow officers.

136. The need for police officers to be trained in these areas was and remains obvious. The City's failure to train Chicago police officers as alleged in the preceding paragraph caused Plaintiff's wrongful conviction and his injuries.

137. The City's failure to train, supervise, and discipline its officers, including the individual defendants in this case, condones, ratifies, and sanctions the kind of misconduct that Defendants committed against Plaintiff.

138. The City of Chicago and final policymaking officials within the Chicago Police Department failed to act to remedy the patterns of abuse described in the preceding paragraphs, despite actual knowledge of the pattern of misconduct. They thereby perpetuated the unlawful practices and ensured no action would be taken (independent of the judicial process) to remedy Plaintiff's ongoing injuries.

139. The policies and practices described in the foregoing paragraphs were also approved by the City of Chicago policymakers, who were deliberately indifferent to the violations of constitutional rights described in this complaint.

**Defendant Guevara's History of Framing Innocent Persons**

140. As a result of the Chicago Police Department's policies and practices described above, Defendant Guevara has framed dozens of innocent people over the span of two decades. These victims have lodged independent accusations of similar misconduct against Defendant Guevara.

141. As of the filing of this complaint, 51 people have had their convictions thrown out because of Defendant Guevara's misconduct. They are Jacques Rivera, Juan Johnson, Jose Montanez, Armando Serrano, Jorge Pacheco, Roberto Almodovar, William Negron, Jose Maysonet, Angel Rodriguez, Santos Flores, Arturo DeLeon-Reyes, Gabriel Solache, Ariel Gomez,

Xavier Arcos, Ricardo Rodriguez, Robert Bouto, Thomas Sierra, Geraldo Iglesias, Demetrius Johnson, David Gecht, Richard Kwil, Ruben Hernandez, Juan Hernandez, Rosendo Hernandez, Ray Munoz, David Lugo, Carlos Andino, Daniel Rodriguez, Jaime Rios, Jose Cruz, Marilyn Mulero, Nelson Gonzalez, Johnny Flores, Adolfo Rosario, Eruby Abrego, Jeremiah Cain, Edwin Davila, Alfredo Gonzalez, Gamalier Rivera, Fabian Santiago, Madeline Mendoza, John Martinez, Jose Tinajero, Thomas Kelly, Louis Robinson, Tony Gonzalez, Edwin Ortiz, Oscar Soto, David Krueger, Tyrece Williams, and now Plaintiff Antonio McDowell. These men and women served hundreds of years in prison for crimes they did not commit.

142.    Guevara has a long history of engaging in precisely the kind of investigative misconduct that occurred in this case, including knowingly fabricating false eyewitness identifications, manipulating witnesses, fabricating evidence, suppressing exculpatory evidence, and coercing false confessions and false statements from suspects and witnesses, and using physical and psychological violence, in the course of maliciously prosecuting innocent people. In addition to the cases in which individuals have been exonerated, there are dozens of other identified cases in which Defendant Guevara engaged in serious investigative misconduct.

143.    Given this extensive history of misconduct and the City of Chicago's failure to meaningfully supervise or discipline Guevara and others, it is apparent that Guevara engaged in such misconduct because he had every reason to believe the City of Chicago and its police department condoned his behavior.

144.    Repeatedly, Guevara has invoked his Fifth Amendment right to not answer questions about allegations against him because truthful responses could subject him to criminal liability. Guevara has refused, for example, to respond to allegations that he manipulated dozens of witnesses to provide false identifications; fabricated false evidence; suppressed exculpatory

evidence, including documentary evidence; tortured and abused suspects and witnesses and coerced false statements from them; and committed the misconduct detailed below.

145.    A few examples of Defendant Guevara's misconduct include:

    a.   Bill Dorsch is a former Chicago police detective. While serving with the Chicago Police Department, Dorsch was assigned to investigate a murder. Several months after the murder occurred, Defendant Guevara brought to the police station two juveniles purporting to have witnessed a shooting and recorded the license place of the shooter. Based on the information provided, Detective Dorsch created a photo array for the juveniles in an attempt to identify the shooter. While the first juvenile was viewing the photo array, and before he identified any of the photographs, Defendant Guevara pointed to the suspect's photo and told the juvenile "That's him." The juvenile then agreed with Guevara, identifying the flagged individual as the shooter. Following this, Dorsch directed Defendant Guevara to leave the room and had the other juvenile view the same photo array; this juvenile was unable to make any identification. Based on the first juvenile's identification, the suspect was charged with murder. Subsequently, Dorsch spoke to the two juveniles outside of Defendant Guevara's presence. The juveniles admitted that they were paid to falsely claim that the suspect was the person responsible for the shooting. After prosecutors spoke to the two juveniles, the suspect was released.

    b.   Defendant Guevara's activities have drawn the interest of federal law enforcement officers. In 2001, the FBI authored a special report detailing the criminal activity of Chicago police officer Joseph Miedzianowski and his

associates, including Defendant Guevara. The report details that Defendant Guevara, while acting in his capacity as a police officer, would apprehend drug and gun dealers and then allow them to "buy their way of trouble." According to the report, Guevara also took bribes to alter both positive and negative lineups of murder suspects. Finally, the report states that Guevara, using an attorney as a conduit, would receive cash in exchange for the ultimate dismissal of murder cases he investigated.

c.   In 1982, Defendant Guevara and another officer arrested and physically assaulted Annie Turner for smoking on a bus. Guevara called her a "bitch" and pushed her out of the back door of the bus. He twisted her arm, threatened to "snap" it, and handcuffed her so tightly that her skin broke. He also hit her across the face with a metal bracelet he was wearing and called her a "nigger bitch." Turner sought medical treatment and filed a complaint with the Chicago Police Department's Office of Professional Standards (OPS).

d.   In 1982, Defendant Guevara and three other officers broke through Almarie Lloyd's locked front door and conducted a warrantless search of her home. When Lloyd asked who they were, she was told to shut up. The officers terrified Lloyd, her brother, and her two children, and left the home in shambles. Lloyd filed a complaint with OPS the next day.

e.   In 1983, Defendant Guevara and other officers forcibly removed Leshurn Hunt from his home and handcuffed him to a ring in the wall at the police station where he was beaten on the head, face, and body until he confessed to murder and robbery. Hunt was detained for approximately 23 hours and deprived of

24

food, water, and sleep until he confessed. The criminal court suppressed Hunt's confession, and a jury returned a favorable verdict in a related civil rights action against the City of Chicago on Hunt's claim of excessive detention.

f.   In 1984, Defendant Guevara and other officers physically assaulted Graciela Flores and her 13-year-old sister, Ana, during a search of their home. During the search, officers did not identify themselves as police. Guevara repeatedly slapped Graciela, called her a "bitch," and pulled her hair. As a result of this incident, Graciela's arm was put in a sling, and she spent one week in the hospital.

g.   In 1985, Defendant Guevara attempted to coerce a false statement from Reynaldo Munoz. Guevara handcuffed Munoz and put him in the back of a squad car. When Munoz denied any knowledge of the incident Guevara was asking about, Guevara repeatedly punched Munoz in the mouth. Guevara then took Munoz to rival gang territory where he allowed rival gang members to spit on and beat Munoz.

h.   In 1986, Defendant Guevara threw Rafael Garcia against a car, struck him in the face several times, kicked him, and hit him in the head. Garcia filed a complaint with OPS. Guevara denied the charges, but OPS found Guevara had lied about the incident and recommended Guevara be suspended for two days.

i.   In 1986, Defendant Guevara and two other officers coerced a confession from Daniel Pena by beating him with their hands and flashlights.

j.   In 1986, Defendant Guevara pulled over Melvin Warren because Warren cut him off while driving. Guevara called Warren a "nigger dog" and "threatened

to tear [Warren's] head off." Guevara hit Warren in the face with a closed fist and then forced him down into the front seat of his car and began to choke him. OPS sustained Warren's allegations that Guevara had physically and verbally assaulted him and recommended that Guevara be reprimanded.

k. In 1988, Defendant Guevara, in concert with his partner Steve Gawrys, and under the supervision of Ed Mingey, caused 12-year-old Orlando Lopez to falsely identify Jacques Rivera as the person who shot Felix Valentin. As a result, Rivera was wrongfully convicted of the Valentin murder.

l. Also, during the Felix Valentin shooting investigation, Defendant Guevara falsely claimed the victim, Valentin, identified Jacques Rivera as his shooter before he died. Guevara reported to have obtained this identification at a time when the victim was in a medically induced coma, unresponsive to any stimuli, and laying in a bed that was in constant motion to prevent his lungs from filling with fluid and killing him. Valentin could not possibly have provided the information that Defendant Guevara attributed to him.

m. After Jacques Rivera's exoneration, he brought suit against Defendant Guevara. A federal jury found that Guevara had violated Rivera's civil rights and awarded Rivera $17 million in damages, as well as $175,000 in punitive damages against Defendant Guevara, his partner Defendant Gawrys, and his supervisor Ed Mingey.

a. In 1989, Defendant Guevara coerced Samuel Perez into falsely identifying Juan Johnson as the person who killed Ricardo Fernandez. Guevara made Perez get

inside his car, showed Perez a photo of Johnson, and told Perez he wanted Johnson to take the blame for the murder.

b. In 1989, Defendant Guevara also coerced Salvador Ortiz into making a false identification of Juan Johnson, which Ortiz later recanted.

c. Juan Johnson was exonerated and brought suit against Defendant Guevara. A federal jury found that Guevara framed Johnson for murder and awarded Johnson $21 million in damages.

d. In 1989, Defendant Guevara coerced Virgilio Muniz into making a false identification by repeatedly threatening Muniz, saying that if Muniz did not identify Manuel Rivera as the murderer, Muniz would "go down for the murder."

e. In 1989, Defendant Guevara coerced Virgilio Calderon Muniz (unrelated to Virgilio Muniz, described in the above paragraph) into making a false identification by telling him who to identify and making a veiled threat as to what would happen if he did not comply.

f. In 1989, Defendant Guevara coerced a false confession from Victor Vera by transporting him to rival gang territory and threatening to release him unless he confessed to the murder of Edwin Castaneda. Fearing for his life, Vera agreed to falsely confess to a crime that he had nothing to do with.

g. In 1990, Defendant Guevara paid two juvenile witnesses to falsely identify a suspect from a photo array in a shooting investigation, leading to the suspect's wrongful conviction.

h.  In 1991, Defendant Guevara coerced Wilfredo Rosario into making a false identification and giving false testimony before the grand jury. Guevara threatened that if Rosario did not identify Xavier Arcos as the murderer, Rosario would be "pinned" for the murder. Guevara fed Rosario details of the crime, such as the number of shots fired, the type of vehicle used in the crime, and the participants in the crime. Rosario recanted his identification of Arcos at trial, but Arcos was still wrongfully convicted.

i.  In 1991, Defendant Guevara told Efrain and Julio Sanchez to pick David Colon out of a lineup. As a result, these men falsely accused Colon of committing a murder, though they later recanted citing Guevara's misconduct.

j.  In 1991, Defendant Guevara coerced David Rivera into signing a confession for murder by intimidation, threats, and inducements. Guevara told Rivera that if he confessed, he would serve seven years in prison; if he did not confess, he would be sent away for 50 years. Guevara then promised Rivera that if he signed a statement, he could go home.

k.  In 1991, Defendant Guevara framed Demetrius Johnson for killing Edwin Fred. Guevara suppressed a lineup report documenting that a key eyewitness had identified a different person as the perpetrator in a lineup, and he fabricated a false police report to make it appear as if that identification had never occurred. Guevara also manipulated and fabricated three other eyewitness identifications of Johnson as the shooter.

l.  In 1992, Defendant Guevara illegally prevented any adult or youth officer from being present while he interrogated juvenile Jacqueline Montanez. As a result, Montanez was wrongfully convicted of murder.

m.  In 1993, Defendant Guevara coerced Carl Richmond into falsely identifying Robert Bouto as the murderer of one of Richmond's friends.

n.  In 1993, Defendant Guevara arrested 15-year-old Eliezar Cruzado and threatened him with life imprisonment if Cruzado did not make a statement implicating himself in a murder. Guevara also told Cruzado that he could go home and see his family again, but only if he agreed to make a statement. At the time, Cruzado had a limited ability to read and write.

o.  In 1993, Defendant Guevara used physical force and threats to coerce a false confession from Adolfo Frias-Munoz. During the two-day interrogation, Frias-Munoz was handcuffed to a ring on the wall of the interrogation room, hit in the face by Guevara, and beaten by two other officers. Frias-Munoz could hear his wife screaming and his son crying in another room. Guevara threatened Frias-Munoz that if he did not confess, his wife would go to prison, and his children would be taken away. Frias-Munoz, who did not speak English, agreed to falsely confess.

p.  In 1993, Defendant Guevara physically abused and threatened Francisco Vicente to coerce him into falsely implicating Geraldo Iglesias in a murder. Vicente later testified Guevara and other officers beat him, threatened him, and fed him facts to facilitate the false story.

q. In 1994, Defendant Guevara, after 14 hours of interrogation, coerced a confession from Adrian Duta by beating him and telling him he could go home if he signed a statement.

r. In 1995, Defendant Guevara arrested Edwin Davila and, in an attempt to coerce a confession, chained Davila to the wall of an interrogation room and told him that he was going to frame him for murder. After Davila maintained that he was uninvolved, Guevara forced Davila to participate in a lineup in which two witnesses falsely identified Davila as the perpetrator.

s. In 1995, Defendant Guevara coerced Evelyn Diaz into making a false identification and providing false testimony to the Grand Jury by threatening Diaz that, if she did not falsely identify Luis Serrano as the shooter, the Department of Children and Family Services would take away her children.

t. In 1995, Defendant Guevara told Luis Figueroa to falsely identify Angel Diaz as the perpetrator knowing Figueroa did not see anything, causing Figueroa to be wrongfully convicted.

u. In 1995, Defendant Guevara coerced Gloria Ortiz Bordoy into making a false statement and testifying falsely against Santos Flores. During Ortiz Bordoy's hours long interrogation, Guevara yelled in her face, swore at her, threatened that DCFS would take her children, and threatened to hit her.

v. In 1995, Defendant Guevara coerced Rodolfo Zaragoza into falsely identifying Ricardo Rodriguez as the perpetrator of a shooting.

w. In 1995, Defendant Guevara told Jose Melendez to falsely identify Thomas Sierra as the shooter of Noel Andujar, even though Melendez had not seen the

shooter and told Guevara as much. In addition, Guevara wrote false reports saying Melendez and another man identified a car as the one used in the shooting.

x.  In 1995, Defendant Guevara coerced a confession from 17-year-old Santos Flores after handcuffing him to the wall of an interview room and refusing his requests for an attorney. During the 11-hour interrogation, Guevara yelled at him, slapped him, and told him if he did not confess, he would never see the light of day.

y.  In 1996, Defendant Guevara coerced Maria Rivera into making a false identification by unzipping his pants and propositioning her. Rivera later told the prosecutor she had falsely identified an individual in a lineup at Guevara's direction. The prosecution abandoned murder charges against that individual.

z.  In 1996, Defendant Guevara framed Louis Robinson for murder after Robinson refused to pay Guevara protection money or falsely identify Guevara's chosen suspect in a different crime. Guevara coerced an eyewitness into identifying Robinson from a photo array and a lineup and fabricated evidence that Robinson lied about his alibi.

aa. In 1997, Defendant Guevara coerced Robert Ruiz into falsely implicating Freddy and Concepcion Santiago for the murder of Guevarra's nephew. Guevara detained Ruiz repeatedly over a 10-day period, locking him in an interrogation room without food, water, or access to the bathroom. Guevara told Ruiz who to identify and what to say in his statement.

bb. In 1997, Defendant Guevara coerced a false confession from Voytek Dembski by beating him while he was chained to a wall in a locked interrogation room. Guevara interrogated Dembski, a Polish national who did not speak English, without Miranda warnings, without notification to the Polish consulate, and without a Polish language interpreter. Dembski could not read the statement he eventually signed as it was written in English.

cc. In 1997, Defendant Guevara used threats and physical force against Ariel Gomez, Paul Yalda, and several of their co-defendants to try to get them to sign false statements incriminating Gomez in the shooting of Concepcion Diaz. Guevara also used pressure and threats to try to force three eyewitnesses, Ruth Antonetty, Debbie Daniels and Maria Castro, to falsely identify Ariel Gomez as the shooter even after they informed Guevara that they could not.

dd. In 1997, Defendant Guevara coerced witnesses into identifying Oscar Soto from lineups in two separate murder investigations, even though witnesses had identified the true perpetrator of one of the crimes ten days earlier, before Guevara was ever involved in the investigation.

ee. In 1998, Defendant Guevara tried to extract a false confession from Rosauro Mejia by beating Mejia. Mejia never confessed and was finally released after being held in custody for three days.

ff. In 1998, Defendant Guevara repeatedly pulled Adriana Mejia's hair and struck her on the back of her neck while interrogating her. She asserts that Guevara never took an accurate statement from her, despite that she did have real knowledge of the crime he was questioning her about.

gg. In 1998, Defendant Guevara repeatedly threatened and beat Arturo DeLeon-Reyes to coerce DeLeon-Reyes into giving an incriminating statement. After two days of isolation and interrogation, DeLeon-Reyes provided a false statement implicating himself in a murder in which he was not involved.

hh. In 1998, Defendant Guevara beat Gabriel Solache while Solache was chained to the wall of a locked interrogation room. After 40 hours of interrogation, Solache gave a false statement so the beating would stop. Solache sought medical treatment and sustained permanent hearing loss to his left ear.

ii. In 1999, Defendant Guevara and his colleagues used physical violence to coerce David Gecht into adopting a fabricated statement, fed to him by Guevara, confessing to a shooting of which he had no knowledge.

jj. In addition, Guevara coerced Gecht's pregnant girlfriend, Colleen Miller, into falsely implicating Gecht in a shooting, telling her she would be arrested, and her baby would be born in prison and taken from her if she did not cooperate.

kk. In November 2001, Defendant Guevara's girlfriend, Judith Martinez, attended a trial where Guevara was testifying and watched other witnesses' testimony. She told Guevara about the other witnesses' testimony before he took the stand, in violation of a court order sequestering witnesses.

ll. In 2001, the FBI authored a special report detailing the criminal activity of Chicago police officer Joseph Miedzianowski and his associates, including Defendant Guevara. The FBI reported that Guevara, while acting as a police officer, solicited bribes from drug and gun dealers in exchange for the promise

not to arrest them; took bribes to alter lineups of murder suspects; and took cash in exchange for dismissing murder cases he investigated.

mm.   In 2011, the First District Appellate Court granted Tony Gonzalez a post-conviction hearing based on evidence that Defendant Guevara conducted an unduly suggestive lineup.

146.   Neither the City of Chicago nor the Chicago Police Department ever disciplined Defendant Guevara for any of the above misconduct.

147.   In fact, the City of Chicago failed to supervise or discipline its police officers, including Defendants Guevara and the other Defendants. Defendants engaged in the misconduct set forth in this complaint because they knew the City of Chicago and its police department tolerated and condoned such conduct.

## COUNT I
## 42 U.S.C. § 1983 – Due Process
## (Fourteenth Amendment)

148.   Plaintiff incorporates each paragraph of this complaint as if fully restated here.

149.   As described above, Defendants, while acting individually, jointly, and in conspiracy with each other, and under color of law and within the scope of their employment, deprived Plaintiff of his constitutional right to a fair trial and his right not to be wrongfully convicted and imprisoned.

150.   In the manner described above, Defendants fabricated witness statements falsely implicating Plaintiff in the crime.

151.   Defendants knew this evidence was false.

152. Defendants obtained Plaintiff's conviction using this false evidence, and they failed to correct fabricated evidence they knew was false when it was used against Plaintiff during his criminal case.

153. Defendants also fabricated supposed eyewitness identifications of Plaintiff, which they knew were false and unreliable, using threats to force witnesses to falsely identify Plaintiff. Defendants caused the State to use those false identifications against Plaintiff at his criminal trial.

154. In addition, Defendants deliberately withheld exculpatory evidence from state prosecutors, Plaintiff, and Plaintiff's criminal defense attorneys, including evidence that Defendants had manufactured false identifications of Plaintiff, thereby misleading and misdirecting the criminal prosecution of Plaintiff.

155. In addition, Defendants concealed, fabricated, and destroyed other evidence not yet known to Plaintiff.

156. The Defendants' misconduct caused Plaintiff's unjust and wrongful criminal prosecution and deprivation of liberty, violating his right under the Fourteenth Amendment to a fair trial. Absent Defendants' misconduct, Plaintiff's prosecution could not and would not have been pursued.

157. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally and in total disregard of the truth and Plaintiff's clear innocence.

158. As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, forced and involuntary prison labor, and other grievous and continuing injuries and damages as set forth above.

159.    Defendants undertook the misconduct described in this Count pursuant to the policies and practices of the City of Chicago and the Chicago Police Department, in the manner more fully described below.

## COUNT II
### 42 U.S.C. § 1983 – Malicious Prosecution and Unlawful Detention
### (Fourth and Fourteenth Amendments)

160.    Plaintiff incorporates each paragraph of this complaint as if fully restated here.

161.    As described above, Defendants, individually, jointly, and in conspiracy with each other, and under color of law and within the scope of their employment, accused Plaintiff of criminal activity and exerted influence to initiate, continue, and perpetuate judicial proceedings against Plaintiff. They did so without any probable cause and despite knowing Plaintiff was innocent, in violation of his rights secured by the Fourth and Fourteenth Amendments.

162.    In so doing, Defendants maliciously prosecuted Plaintiff, caused Plaintiff to be deprived of his liberty without probable cause, and caused Plaintiff to be improperly subjected to judicial proceedings for which there was no probable cause. These judicial proceedings were instituted and continued maliciously, resulting in injury.

163.    The misconduct described in this Count was objectively unreasonable, and Defendants undertook the misconduct intentionally and in total disregard of the truth and Plaintiff's clear innocence.

164.    As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

165.    Defendants undertook the misconduct described in this Count pursuant to the policies and practices of the City of Chicago and the Chicago Police Department, in the manner more fully described below.

## COUNT III
### 42 U.S.C. § 1983 – Failure to Intervene

166.    Plaintiff incorporates each paragraph of this complaint as if fully restated here.

167.    As described above, during the constitutional violations described in this complaint, one or more of the Defendants stood by without intervening to prevent the violation of Plaintiff's constitutional rights.

168.    Defendants had ample, reasonable opportunities and the duty to prevent this harm but failed to do so.

169.    The misconduct described in this Count was objectively unreasonable, and Defendants undertook the misconduct intentionally and in total disregard of the truth and Plaintiff's clear innocence.

170.    As a result of these Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

171.    The misconduct described in this Count by the Defendants was undertaken pursuant to the policies and practices of the City of Chicago and the Chicago Police Department, in the manner more fully described below in Count V.

## COUNT IV
### 42 U.S.C. § 1983 – Conspiracy to Violate Constitutional Rights

172.    Plaintiff incorporates each paragraph of this complaint as if fully restated here.

173.     As described more fully above, Defendants, acting in concert with other co-conspirators, known and unknown, reached an agreement among themselves to fabricate and suppress evidence to detain, prosecute, and convict Plaintiff, without regard for Plaintiff's guilt or innocence, and thereby to deprive him of his constitutional rights.

174.     In so doing, these co-conspirators agreed to accomplish an unlawful purpose by an unlawful means. In addition, these co-conspirators agreed among themselves to protect each other from liability for depriving Plaintiff of those rights.

175.     In furtherance of their conspiracy, each co-conspirator committed overt acts and was otherwise a willful participant in joint activity.

176.     The misconduct described in this Count was objectively unreasonable, and Defendants undertook the misconduct intentionally and in total disregard of the truth and Plaintiff's clear innocence.

177.     As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

178.     Defendants undertook the misconduct described in this Count pursuant to the policies and practices of the City of Chicago and the Chicago Police Department, in the manner more fully described below.

### COUNT V
### 42 U.S.C. § 1983 – Policy and Practice Claim against the City of Chicago

179.     Plaintiff incorporates each paragraph of this complaint as if fully restated here.

180.     As described in detail above, the City of Chicago is liable for the violation of Plaintiff's constitutional rights because Plaintiff's injuries were caused by the City's policies, practices, and customs, as well as by the actions of policy-making officials for the City of Chicago.

181.    At all relevant times, and for a period of time before and after Plaintiff's wrongful conviction, the City of Chicago failed to promulgate proper or adequate rules, regulations, policies, and procedures for: conducting photographic and live lineup procedures by officers and agents of the Chicago Police Department and City of Chicago; conducting interrogations and questioning criminal suspects; collecting, documenting, preserving, testing, and disclosing evidence; writing police reports and taking investigative notes; obtaining statements and testimony from witnesses; and maintaining investigative files and disclosing those files in criminal proceedings. In addition, or alternatively, the City of Chicago failed to promulgate proper and adequate rules, regulations, policies, and procedures for training and supervising officers and agents of the Chicago Police Department and the City of Chicago, with respect to these subjects.

182.    At all relevant times, and for a period of time before Plaintiff's wrongful conviction, the City of Chicago had notice of a widespread practice and custom by officers and agents of the Chicago Police Department and the City of Chicago under which individuals suspected of criminal activity, like Plaintiff, were routinely deprived of their right to due process. For instance, it was common that suspects were prosecuted based on fabricated evidence, including fabricated eyewitness identifications and eyewitness identifications obtained using manipulated photographic or live lineup procedures.

183.    Specifically, at all relevant times and for a period of time prior thereto, there existed a widespread practice and custom among officers, employees, and agents of the City of Chicago, under which criminal suspects were coerced to involuntarily implicate themselves by various means, including the following: (1) individuals were subjected to unreasonably long and uninterrupted interrogations, often lasting for many hours and even days; (2) individuals were subjected to actual and threatened physical or psychological violence; (3) individuals were

interrogated at length without proper protection of their constitutional right to remain silent; (4) individuals were forced to sign or assent to oral and written statements fabricated by the police; (5) officers and employees were permitted to lead or participate in interrogations without proper training or knowledge of necessary safeguards against abusive conditions and involuntarily and/or false confessions; and (6) supervisors with knowledge of permissible interrogation techniques did not properly supervise or discipline officers and employees, causing coercive interrogations to continue unchecked.

184.     In addition, at all relevant times and for a period of time before and after Plaintiff's wrongful conviction, the City of Chicago had notice of widespread practices by officers and agents of the Chicago Police Department and the City of Chicago, including that officers: (1) did not record investigative information in police reports, maintain proper investigative files, or disclose investigative materials to prosecutors and criminal defendants; (2) falsified witnesses' statements and testimony; (3) fabricated false evidence implicating criminal defendants in criminal conduct; (4) failed to maintain or preserve evidence or destroyed evidence; and (5) pursued wrongful convictions through profoundly flawed investigations.

185.     These widespread practices, individually and together, were allowed to flourish because the City of Chicago's leaders, supervisors, and policymakers directly encouraged and were thereby the moving force behind the very type of misconduct that occurred in Plaintiff's case. They did this by failing to adequately train and supervise their officers, agents, and employees on proper interrogation techniques and by failing to adequately punish and discipline past instances of similar misconduct, which directly encouraged future abuses like those affecting Plaintiff.

186.     The above widespread practices and customs, so well settled as to constitute de facto policies of the City of Chicago, were able to exist and thrive, individually and together,

because policymakers with authority exhibited deliberate indifference to the problem, thereby effectively ratifying it.

187.     As a result of the City of Chicago's policies and practices, numerous individuals have been wrongly convicted of crimes they did not commit.

188.     Defendants undertook the misconduct described in this Count pursuant to the City of Chicago's policies and practices in that the constitutional violations committed against Plaintiff were committed with the knowledge or approval of persons with final policymaking authority for the City of Chicago or were actually committed by persons with such final policymaking authority.

189.     Plaintiff's injuries were directly and proximately caused by officers, agents, and employees of the City of Chicago, including the individually named defendants, who acted pursuant to one or more of the policies, practices, and customs set forth above in engaging in the misconduct described in this Count.

### COUNT VI
### State Law Claim – Malicious Prosecution

190.     Plaintiff incorporates each paragraph of this complaint as if fully restated here.

191.     As described above, Defendants, individually, jointly, and in conspiracy with each other, and within the scope of their employment, accused Plaintiff of criminal activity and exerted influence to initiate, continue, and perpetuate judicial proceedings against Plaintiff without any probable cause for doing so.

192.     In so doing, Defendants caused Plaintiff to be subjected improperly to judicial proceedings for which there was no probable cause. Those judicial proceedings were instituted and continued maliciously, resulting in injury.

193. The judicial proceedings were terminated in Plaintiff's favor and in a manner indicative of his innocence when his conviction was vacated and charges against him were dropped in July 2024.

194. The misconduct described in this Count was objectively unreasonable and Defendants undertook the misconduct intentionally, with malice, and in total disregard of the truth and Plaintiff's clear innocence.

195. As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

### COUNT VII
### State Law Claim – Intentional Infliction of Emotional Distress

196. Plaintiff incorporates each paragraph of this complaint as if fully restated here.

197. Defendants' actions, omissions, and conduct described above were extreme and outrageous. Their actions were rooted in an abuse of power and authority. And Defendants undertook their actions intending to cause, or recklessly disregarding the probability their conduct would cause, severe emotional distress to Plaintiff, as is more fully alleged above.

198. As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

### COUNT VIII
### State Law Claim – Willful and Wanton Conduct

199. Plaintiff incorporates each paragraph of this complaint as if fully restated here.

200. At all times relevant to this complaint Defendants had a duty to refrain from willful and wanton conduct.

42

201.    Notwithstanding that duty, Defendants acted willfully and wantonly through a course of conduct that showed an utter indifference to, or conscious disregard of, Plaintiff's rights.

202.    As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

**COUNT IX**
**State Law Claim – Civil Conspiracy**

203.    Plaintiff incorporates each paragraph of this complaint as if fully restated here.

204.    As described more fully in the preceding paragraphs, Defendants, acting in concert with other co-conspirators, known and unknown, reached an agreement among themselves to frame Plaintiff for a crime he did not commit and conspired by concerted action to accomplish an unlawful purpose and/or to achieve a lawful purpose by unlawful means. In addition, these co-conspirators agreed among themselves to protect each other from liability for depriving Plaintiff of his rights.

205.    In furtherance of their conspiracy, each co-conspirator committed overt acts and was otherwise a willful participant in joint activity.

206.    The violations of Illinois law described in this complaint, including Defendants' malicious prosecution of Plaintiff and their intentional infliction of emotional distress, were accomplished by Defendants' conspiracy.

207.    The misconduct described in this Count was objectively unreasonable, and Defendants undertook the misconduct intentionally and in total disregard of the truth and Plaintiff's clear innocence.

208.    As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

## COUNT X
### State Law Claim – *Respondeat Superior*

209.    Plaintiff incorporates each paragraph of this complaint as if fully restated here.

210.    While committing the misconduct alleged in the preceding paragraphs, the individual defendants were employees, members, and agents of the City of Chicago, acting at all relevant times within the scope of their employment.

211.    Defendant City of Chicago is liable as principal for all torts committed by its agents.

## COUNT XI
### State Law Claim – Indemnification

212.    Plaintiff incorporates each paragraph of this complaint as if fully restated here.

213.    Illinois law provides that public entities are directed to pay any tort judgment for compensatory damages for which employees are liable within the scope of their employment activities.

214.    The individual defendants were employees, members, and agents of Defendant City of Chicago, acting at all relevant times within the scope of their employment in committing the misconduct described herein.

215.    Defendant City of Chicago is responsible to pay any judgment entered against the individual defendants.

WHEREFORE, Plaintiff Antonio McDowell respectfully requests this Court enter a judgment in his favor and against Defendants Reynaldo Guevara, Bernard Brennan, Richard Maher, Daniel Engel, Hector Vergara, Alan Pergande, James Gilger, Randy Troche, Geri Lynn

Yanow as special representative for the Estate of Ernest Halvorsen, Edward Mingey, Robert Biebel, Philip J. Cline, and the City of Chicago, awarding compensatory damages, attorneys' fees, and costs against each individual defendant, punitive damages against each individual defendant, pre- and post-judgment interest, and any other relief the Court deems just and appropriate.

## JURY DEMAND

Plaintiff Antonio McDowell hereby demands a trial by jury under Federal Rule of Civil Procedure 38(b) on all issues so triable.

Dated: December 2, 2025                    Respectfully submitted,

Antonio McDowell

By: /s/ Lyla Wasz-Piper
*Counsel for Plaintiff*

Jon Loevy
Anand Swaminathan
Steve Art
Lyla Wasz-Piper
Aaditya Tolappa
LOEVY & LOEVY
311 N Aberdeen St, 3rd Fl
Chicago, IL 60607
(312) 243-5900