**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| ANTONIO MCDOWELL, | ) | |
| | ) | |
| *Plaintiff,* | ) | Case No.: 25-CV-14635 |
| | ) | |
| v. | ) | Hon. Elaine E. Bucklo |
| | ) | District Judge |
| REYNALDO GUEVARA, et al., | ) | |
| | ) | |
| *Defendants.* | ) | |
| | ) | JURY TRIAL DEMANDED |
| | ) | |

**PLAINTIFF'S RESPONSE IN OPPOSITION TO
DEFENDANTS CLINE, MINGEY, AND BIEBEL's MOTION TO DISMISS**

Plaintiff Antonio McDowell was just 19 years old when a group of Chicago Police Department officers framed him for a murder and carjacking they knew he did not commit. As a result, McDowell was wrongfully convicted and spent almost 23 years in prison. Nearly three decades after his arrest, DNA evidence proved his innocence, the courts vacated his conviction, and state prosecutors dropped all charges. McDowell filed this lawsuit against the officers who secured his wrongful conviction ("Defendants") to vindicate the rights they violated.

Now, three officers—Robert Biebel, Edward Mingey, and Philip Cline ("Moving Defendants")—move to dismiss McDowell's claims against them. But as with all Defendants, McDowell has plausibly alleged that the Moving Defendants were personally involved in coercing and fabricating false eyewitness identifications of him that served as the only evidence against him at trial. The Moving Defendants' suggestion at the motion-to-dismiss stage that they are somehow less culpable because of their rank within the police department must wait for a later stage of this case, most likely trial. Independently, McDowell has also plausibly alleged that the Moving Defendants are liable as supervisors because they knowingly signed and approved false reports

1

incriminating McDowell based on the identifications they knew had been fabricated. In arguing otherwise, the Moving Defendants mischaracterize the law and improperly contest McDowell's factual allegations, which the Court must accept as true at this stage.

The Moving Defendants' factual arguments at the motion-to-dismiss stage are not just improper. They are surprising. In other lawsuits alleging nearly identical misconduct, these same Moving Defendants have been named as defendants, have not moved to dismiss, and have testified that they regularly reviewed detectives' homicide files, audited those files to ensure detectives had followed policy and pursued all leads, and took active roles in supervising investigations. *See Geinosky v. City of Chicago*, 675 F.3d 743, 745 n.1 (7th Cir. 2012) (holding that "in opposing a Rule 12(b)(6) motion," a plaintiff "may elaborate on his factual allegations so long as the new elaborations are consistent with the pleadings"). The detectives they testified about in those other cases are the same Defendants named here. Claims against at least one of the Moving Defendants have even proceeded to trial in another Guevara case. *See Rivera v. Guevara*, 319 F. Supp. 3d 1004, 1050–51 (N.D. Ill. 2018) (Bucklo, J.) (allowing claims against Mingey to be tried). What is more, the Moving Defendants have not moved to dismiss in more than two dozen recent and pending Guevara cases alleging similar misconduct, except, apparently, in another case before this Court. *See* Motion to Dismiss, *Williams v. Guevara*, No. 1:25-cv-13620 (Apr. 27, 2026), Dkt. 108 (Biebel, but not Mingey, moving to dismiss). The Moving Defendants' varied approaches in the Guevara cases cannot be explained by reference to anything in Rule 8 or Rule 12, and they strain credulity by suggesting that they were not involved in their detectives' investigating this particular case.

The Court should deny the Moving Defendants' motion to dismiss.

2

## BACKGROUND[1]

On December 21, 1996, someone shot and killed Mario Castro outside his home in Humboldt Park. Dkt. 1 ¶¶ 22–23. Two of Castro's relatives—Alberto Varela and Juan Medina— saw the perpetrator flee the scene, but neither got a good look at him. *Id.* ¶¶ 26–28, 35–38. A short time later and just a few blocks away, the perpetrator stole Ruth Morales-Santana's car at gunpoint and sped away. *Id.* ¶ 30. Police later found the stolen car near 1713 North Luna Avenue. *Id.* ¶ 31.

The Chicago Police Department responded to the scene. *Id.* ¶ 32. Detectives from the Area Five Violent Crimes Division, including Defendants Halvorsen, Guevara, Engel, Vergara, Pergande, and Troche were assigned to investigate. *Id.* ¶ 33. Defendants Biebel and Mingey were the sergeants assigned to supervise the investigation. *Id.* ¶ 34. And Defendant Cline, who was the Commander of Area Five, supervised both the sergeants and the detectives. *Id.*

The eyewitnesses could describe little about the perpetrator. *Id.* ¶ 35. Medina gave no description at all. *Id.* ¶ 38. Nevertheless, Defendants wrote a false report that he "would be able to identify the Offender if he [saw] him again." *Id.* Varela and Morales-Santana told the police only that the perpetrator was a Black man with medium complexion, roughly 28 years old, who wore a Nike hat and jacket. *Id.* ¶¶ 36, 66–67. Defendants took Varela and Morales-Santana back to Area Five to view photo books and make an identification. *Id.* ¶ 39. The photo books included a picture of McDowell. *Id.* Neither Varela nor Morales-Santana could make an identification. *Id.* So Defendants used their descriptions to create a composite sketch of the perpetrator. *Id.* ¶ 40.

Defendants, including Biebel, Mingey, and Cline, also instructed officers to canvas the 1700 block of North Luna, where police had found Morales-Santana's car. *Id.* ¶ 41. Based on what

---

[1] McDowell recites facts as alleged in his complaint. At this stage, the Court must accept these allegations as true and draw all reasonable inferences in McDowell's favor. *Pierce v. Zoetis, Inc.*, 818 F.3d 274, 277 (7th Cir. 2016).

officers learned, Defendants, including Biebel, Mingey, and Cline, determined that a single individual had shot Castro, fled on foot, stolen Morales-Santana's car, driven away, and abandoned the car. *Id.* ¶ 42. Defendants also concluded the perpetrator probably lived around where the car had been discarded. *Id.* Defendants showed witnesses the composite sketch and noted in reports that "Hopefully someone in the 'Hood' will recognize the offender." *Id.* ¶ 43. Yet the investigative file lacks any record of Defendants showing the composite to anyone in the neighborhood or doing any other investigative work on this case for seven months. *Id.* ¶ 44.

Seven months later, in July 1997, McDowell was shot in the hand during an unrelated drive-by shooting. *Id.* ¶ 46. While in the hospital, McDowell told police he had not seen his shooter. *Id.* ¶ 47. Later, Defendants found McDowell on the street, brought him to the police station, sat him down in an interrogation room, showed him a photo book, and told him it contained the photo of his shooter. *Id.* ¶¶ 48–50. McDowell repeated that he had not seen who shot him. *Id.* ¶ 50. Defendants then handed him four individual photos and asked him if any showed his shooter. *Id.* He again said that he did not know. *Id.* ¶ 51. Finally, Defendant Guevara pointed to one of the photos—a Latino man—and instructed McDowell to identify the man as his shooter. *Id.* McDowell continued to refuse. *Id.* ¶ 52. Defendant Guevara grew agitated, handcuffed McDowell's wounded hand to the wall of the interrogation room, and left him there for hours, intermittently coming in to ask McDowell whether he was ready to falsely identify the Latino man as his shooter. *Id.* ¶¶ 52–53. McDowell begged to leave, but Defendant Guevara would not let him go. *Id.* ¶ 54.

Because McDowell refused to help them frame someone else, Defendants, including Biebel, Mingey, and Cline, decided to target him as the perpetrator of the Castro shooting. *Id.* ¶¶ 57, 60. To that end, Defendants brought Medina, who had seen Castro's shooter but could not provide a description, to Area Five to look at more photos. *Id.* ¶ 58. Defendants never explained

4

how or why they suddenly decided to show Medina more photos, or why they now believed the photos they showed him featured the offender. *Id.* ¶ 59. Knowing Medina could not identify the shooter, Defendant Guevara showed him a photo of McDowell and told him to identify McDowell as Castro's shooter. *Id.* ¶ 63. Defendant Guevara knowingly manufactured Medina's false photo identification and knowingly created a false police report describing it as legitimate. *Id.* ¶ 64.

Then, Defendants went to Varela's and Morales-Santana's homes. *Id.* ¶ 65. Defendants knew these witnesses' descriptions did not match McDowell; he had dark complexion and was just 19 years old, whereas they had described a 28-year-old with medium complexion. *Id.* ¶¶ 66–67. So Defendants coerced Varela and Morales-Santana into falsely identifying McDowell as Castro's shooter and Morales-Santana's carjacker. *Id.* ¶ 68. Defendants then brought Varela and Morales-Santana to Area Five, had them look through McDowell's interrogation window, and instructed them to identify McDowell in the lineup the Defendants would soon administer. *Id.* ¶¶ 69–70.

Defendant Guevara continued to drop into McDowell's interrogation room to ask him if he was ready to identify the Latino man Defendant Guevara had pointed out. *Id.* ¶ 71. McDowell continued refusing to do so. *Id.* ¶ 72. Then, Defendants placed McDowell in live lineups and instructed Varela, Medina, and Morales-Santana to falsely pick him as the perpetrator of the shooting and carjacking, despite knowing that McDowell did not match their descriptions and had no connection to the crimes. *Id.* ¶ 73. Afterward, Defendants fabricated reports falsely stating that Varela, Medina, and Morales-Santana had legitimately identified McDowell as the shooter and carjacker. *Id.* ¶ 74. Defendants Biebel, Mingey, and Cline knew that the identifications of Plaintiff were fabricated, but approved the false police reports, knowing their falsity. *Id.* ¶ 75.

After the false identifications, Defendant Guevara tried to convince McDowell to falsely confess. *Id.* ¶ 76. McDowell refused and denied knowing anything about the crimes Defendant

5

Guevara described. *Id.* Defendant Guevara then told McDowell that because he had refused to help the Defendants plant a case on a man they wanted to take down, McDowell was the one who would go to prison for the rest of his life. *Id.* ¶ 77.

After arresting McDowell for shooting Castro and stealing Morales-Santana's car, which Defendants knew he had nothing to do with, Defendants, including Biebel, Mingey, and Cline, suppressed all material exculpatory and impeaching evidence, such as the early investigative leads that all pointed to a different suspect. *Id.* ¶ 79. For example, Defendants suppressed the photo books they showed Varela and Morales-Santana, which contained a photo of McDowell, but from which neither could identify the perpetrator. *Id.* ¶¶ 80–81. Defendants also suppressed evidence of Varela and Morales-Santana's initial negative identifications. *Id.* ¶ 81. Similarly, Defendants suppressed evidence that earlier in the investigation, they had concluded the perpetrator lived near the 1700 block of North Luna, where they had found the abandoned getaway car. *Id.* ¶ 84. Indeed, Defendants suppressed all information related to the investigation between December 1996 and July 1997, including the neighborhood where the car had been abandoned. *Id.* Finally, Defendants suppressed the composite photo they created from Varela and Morales-Santana's descriptions. *Id.* ¶ 85. This sketch did not match McDowell, so it would have been exculpatory. *Id.* To this day, the sketch has never been produced and appears nowhere in the investigative file. *Id.* ¶¶ 86–87.

Defendants, including Biebel, Mingey, and Cline, caused McDowell to be prosecuted and convicted for the Castro shooting and subsequent carjacking based on the false evidence they knowingly fabricated. *Id.* ¶ 89. No physical evidence ever connected McDowell to these crimes. *Id.* ¶ 90. So at trial, the case against him relied wholly on the fabricated false identifications that Defendants, including Biebel, Mingey, and Cline, had procured against McDowell. *Id.* ¶ 91. And Defendants suppressed all evidence implicating a different suspect as detailed above. *Id.* ¶ 92. As

6

a result, McDowell was found guilty of first-degree murder, attempted murder, and aggravated vehicular hijacking. *Id.* ¶ 93. At his sentencing, McDowell maintained his innocence. *Id.* ¶ 94. Unconvinced, the court sentenced McDowell to 103 years in prison. *Id.* ¶ 95. McDowell would not have been convicted but for Defendants' fabrication and suppression of evidence. *Id.* ¶ 96. McDowell served 23 years of his sentence. *Id.* ¶ 99. Throughout, he maintained his innocence and insisted that Defendants had framed him. *Id.* ¶¶ 88, 106.

After 23 years, prosecutors asked McDowell to consent to DNA testing, as the perpetrator had left touch DNA on Castro's body and clothing. *Id.* ¶¶ 108–09. The DNA had been collected at the time of the crime and had been well-preserved. *Id.* ¶ 110. McDowell enthusiastically agreed. *Id.* ¶ 111. Tests revealed that the perpetrator's DNA did not match McDowell's, excluding him as the killer. *Id.* ¶ 112. Following agreement from the prosecutors and an evidentiary hearing, the court vacated McDowell's convictions, and the state dismissed all charges. *Id.* ¶¶ 113–14. By the time of his exoneration, McDowell had been fighting the false charges against him for more than half his life. *Id.* ¶ 115.

McDowell now sues Defendants for causing his wrongful conviction. He pleads several claims under federal and state law. Most of the Defendants have not contested the sufficiency of McDowell's allegations. *See* Dkts. 54, 57, 58. Defendants Biebel, Mingey, and Cline move to dismiss pursuant to Rule 12(b)(6). Dkt. 59.

## ARGUMENT

### I. McDowell's § 1983 Claims Clear Rule 8's Liberal Pleading Standard.

The Moving Defendants urge the Court to dismiss McDowell's § 1983 claims because, in their words, his claims "are backed by only conclusory allegations of after-the-fact 'approval'" without "the level of personal involvement required to state a claim." Dkt. 59 at 4. But as explained

below, McDowell has plausibly pleaded that the Moving Defendants personally participated in the misconduct he alleges, and also that they were responsible for violating his rights as supervisors. In arguing otherwise, the Moving Defendants distort both the law of this circuit and the allegations in the complaint. The Court should reject Defendants' strained arguments.[2]

### A. McDowell Has Plausibly Alleged that the Moving Defendants Personally Participated in Violating His Constitutional Rights.

The Moving Defendants contend that McDowell must allege they "actually . . . participated in the constitutional wrongdoing" to hold them liable under § 1983. Dkt. 59 at 4 (quoting *Petrovic v. City of Chicago*, No. 06 C 6111, 2010 WL 1325709, at *2 (N.D. Ill. Mar. 30, 2010)). Even if that were true (as explained below, it is not), McDowell has done so here.

McDowell alleges that after the Moving Defendants personally participated in coercing and fabricating identifications incriminating him, they directly participated in fabricating police reports that contained falsified identifications by approving those fabricated reports. *See* Dkt. 1 ¶¶ 75, 78–87, 92, 154–55, 173. Thus, McDowell has alleged that the Moving Defendants personally violated his due process rights through their cover-up and conspiracy. *Wilson v. Est. of Burge*, 667 F. Supp. 3d 785, 864 (N.D. Ill. 2023).

In addition, officers directly participate in violating an accused's rights by "suppressing exculpatory evidence related to police misconduct," even if the officers themselves did not participate in that misconduct. *See id*. McDowell alleges that after Defendants coerced and fabricated identifications incriminating him, and after the Moving Defendants approved the

---

[2] The Moving Defendants' *sole* argument for dismissal is that McDowell has not alleged they were personally involved in violating his rights. *See* Dkt. 59 at 1. The Moving Defendants do not contest that McDowell states plausible § 1983 claims against their subordinates. *See generally id.* at 4–8. Nor do the Moving Defendants argue that McDowell fails to plead they possessed the "necessary state of mind." *See Bostic v. Murray*, 160 F.4th 831, 841 (7th Cir. 2025). The Moving Defendants have waived those arguments and cannot revive them on reply. *See Griffin v. Bell*, 694 F.3d 817, 822 (7th Cir. 2012).

falsified report, the Moving Defendants suppressed evidence of that fabrication along with other exculpatory and impeaching evidence, including information pointing to a different suspect. *See* Dkt. 1 ¶¶ 75, 78–87, 92, 154–55, 173. Thus, McDowell has alleged that the Moving Defendants personally violated his due process rights through their cover-up and conspiracy. *Wilson*, 667 F. Supp. 3d at 864.

To the extent the Moving Defendants complain that McDowell's allegations against them are based in part on group pleading against "Defendants," this is perfectly appropriate. Where a complaint "attributes individual actions to a group of defendants," courts in this circuit "read[] the complaint to allege that every one of the defendant[s]" engaged in the alleged misconduct. *Heidelberg v. Manias*, 503 F. Supp. 3d 758, 785 (C.D. Ill. 2020) (quoting *Bolden v. City of Chicago*, 293 F. Supp. 3d 772, 776 n.3 (N.D. Ill. 2017)). Doing so is particularly appropriate where "a plaintiff has been injured as the consequence of the actions of an unknown member of a collective body." *Rivera v. Lake County*, 974 F. Supp. 2d 1179, 1194 (N.D. Ill. 2013).

*Heidelberg v. Manias*, 503 F. Supp. 3d at 769, illustrates this principle. There, the plaintiff alleged that various individuals, including sheriffs, deputies, police officers, and prosecutors violated his constitutional rights. His complaint referred to the defendants collectively as the "1970 Defendants." *Id.* The court held that the sheriffs' "inclusion in the '1970 Defendants' group [wa]s sufficient at the pleading stage to infer liability for their individual conduct." *Id.* at 798. So too here. McDowell details specific factual allegations against the "Defendants" collectively, and alleges that the Moving Defendants "participated in the misconduct" along with the others. Dkt. 1 ¶ 20. McDowell cannot be expected to know exactly which officers contributed to which aspects of framing him and then covering it up, which is information that only the Defendants possess. Accordingly, before McDowell has had the chance to engage in discovery, it would be

9

inappropriate for the Court to dismiss his § 1983 claims. *Heidelberg*, 503 F. Supp. 3d at 798. Indeed, dismissing the Moving Defendants at this stage would absolve them of responsibility by virtue of their leadership roles within Area Five.

Finally, the Moving Defendants' suggestion that McDowell alleges only "after-the-fact approval" is a nonstarter given that they directly participated not only in fabricating identifications and approving false police reports throughout the investigation, but also in suppressing exculpatory evidence through McDowell's trial. Dkt. 59 at 4 (internal quotation marks omitted).

**B.** **McDowell Alleges the Moving Defendants Are Personally Responsible for Violating his Rights as Supervisors.**

Additionally and independently, the Seventh Circuit has repeatedly held that "a defendant need not 'participate[] directly in the deprivation' for liability to follow under § 1983." *Backes v. Vill. of Peoria Heights*, 662 F.3d 866, 869–70 (7th Cir. 2011) (citation omitted); *accord Bostic v. Murray*, 160 F.4th 831, 841 (7th Cir. 2025). Rather, a supervisor is personally responsible for a subordinate's constitutional violation if he "approve[d] of the conduct and the basis for it," for example, by "facilitat[ing] it, . . . condon[ing] it, or turn[ing] a blind eye" to it. *See Backes*, 662 F.3d at 870 (citation omitted).

Courts in this circuit have routinely held that a police supervisor is personally responsible for violating an accused person's rights if the supervisor knowingly approves a subordinate's false report incriminating the accused. For example, in *Carter v. City of Chicago*, the plaintiff alleged that officers "created false police reports" stating they found him with drugs, and their sergeant "formally approved those reports, knowing they were false." No. 17 C 7241, 2018 WL 1726421, at *1 (N.D. Ill. Apr. 10, 2018). This Court denied the sergeant's motion to dismiss, holding that the plaintiff had plausibly alleged the sergeant was personally responsible for violating his constitutional rights by "knowingly approving the false reports." *Id.* at *5. Likewise, in *Wilson v.*

10

*Schawndt*, the plaintiff alleged a lieutenant "approved [a subordinate's] police report knowing she made false statements" in it. No. 20-CV-699, 2020 WL 5748258, at *2 (E.D. Wis. Sept. 24, 2020). That was enough to plausibly allege the supervisor's involvement. *Id.* at *3; *see also Iglesias v. Guevara*, No. 19-CV-06508, 2025 WL 3171161, at *8 (N.D. Ill. Nov. 13, 2025) (holding that a jury could find Defendant Biebel personally responsible based on evidence that he knowingly approved a falsified report by subordinate detectives).[3]

McDowell's factual allegations are identical to those in *Carter* and *Wilson*, if not more detailed and specific. He alleges that the Moving Defendants supervised the Defendant detectives, knew those detectives "had coerced and fabricated . . . false identifications" of him, and still "approved the[ir] false police reports—knowing their falsity." *See* Dkt. 1 ¶¶ 20, 34, 75. Just as courts in this circuit have consistently done in similar cases, the Court should allow McDowell's § 1983 claims to proceed to discovery. *See also Heidelberg*, 503 F. Supp. 3d at 798 (inferring based on allegation that defendants conspired together that supervisors "kn[ew] about the actions of their subordinates and, through their own participation in the conspiracy, . . . facilitated it").

### C.   The Moving Defendants Improperly Contest Factual Allegations.

Rather than grappling with McDowell's factual allegations, the Moving Defendants disregard them. They assert that McDowell "merely parrots the elements of a supervisory liability claim," Dkt. 59 at 6, ignoring his specific factual allegations that they knew subordinates had fabricated identifications incriminating him and approved their falsified report anyway, Dkt. 1 ¶ 75. Because the Moving Defendants ignore McDowell's factual allegations, the cases they cite

---

[3] Though *Iglesias* is a summary-judgment decision, its legal holding on supervisors' liability applies with equal force here. "[H]oldings regarding substantive law are applicable across all stages of cases," and "a plaintiff is required to do more to defeat summary judgment than to defeat a motion to dismiss." *In re Manufactured Home Lot Rents Antitrust Litig.*, No. 23-CV-06715, 2025 WL 3485693, at *7 n.7 (N.D. Ill. May 6, 2009). Defendants, however, cannot rely on summary-judgment orders to support dismissal. *Id.*

are inapt. None dealt with specific allegations that a supervisor knew of a subordinate's misconduct and approved of it anyway, as McDowell alleges here.[4] So none justify dismissal.

Then, the Moving Defendants urge the Court to reject as "conclusory" McDowell's specific allegations that they knowingly approved a false police report incriminating him. Dkt. 59 at 7. But they do not cite any authority for the idea that McDowell's factual allegations are "conclusory." Nor could they. As discussed, courts in this circuit have consistently denied motions to dismiss § 1983 claims based on identical allegations. *Wilson*, 2020 WL 5748258, at \*3; *Carter*, 2018 WL 1726421, at \*5. So when the Moving Defendants argue that McDowell's allegations "should not be accepted as true," they seem to mean not that McDowell's allegations are actually "conclusory," but that the role of police supervisor entails something other than what he alleges. *See* Dkt. 59 at 7. In other words, the Moving Defendants plainly contest the factual allegations in McDowell's complaint and rely on supposed facts outside of it. That flips the motion-to-dismiss standard on its head and is wholly inappropriate at this stage. *See Tierney v. Vahle*, 304 F.3d 734, 738 (7th Cir. 2002); *Cushing v. City of Chicago,* 3 F.3d 1156, 1163 (7th Cir. 1993). If the Moving Defendants want to dispute McDowell's allegations, they must wait until summary judgment and beyond, after the parties have had the chance to pursue discovery. *Fuery v. City of Chicago*, No. 07 C 5428, 2009 WL 1270201, at \*2 n.1 (N.D. Ill. May 6, 2009) ("The Court will not countenance this attempt to repaint the allegations of the . . . Complaint. . . . Defendants will have the opportunity to present their version of events at a later point in the litigation."); *see Heller Int'l Corp. v. Sharp*, 839 F.

---

[4] *See Petrovic*, 2010 WL 1325709, at \*1–2 (no factual allegation that supervisory defendant knew of subordinate's misconduct); *Marcinczyk v. Plewa*, No. 09 C 1997, 2011 WL 2672350, at \*1 (N.D. Ill. July 8, 2011) (same); *Willoughby v. Vill. of Fox Lake*, No. 17 CV 2800, 2017 WL 6570084, at \*4 (N.D. Ill. Dec. 21, 2017) (same); *Hopkins v. Dart*, No. 15 C 410, 2016 WL 6124437, at \*1 (N.D. Ill. Oct. 20, 2016) (same); *Ames v. Obaisi*, No. 18 CV 2930, 2021 WL 1853223, at \*4 (N.D. Ill. May 10, 2021) (no allegation that non-medical prison officials knew prison doctor was providing inadequate care).

Supp. 1297, 1304 (N.D. Ill. 1993). The Moving Defendants' refusal to abide by the motion-to-dismiss standard is itself a reason to deny their motion.

The Moving Defendants contest McDowell's factual allegations because they gain no support from the law. The Court should allow McDowell's § 1983 claims to proceed to discovery.

## II. McDowell Has Sufficiently Pleaded that the Moving Defendants are Liable Under Illinois Law.

The Moving Defendants do not contend that McDowell has failed to plead any specific element of any specific state-law claim. *See* Dkt. 59 at 7–8. Rather, they argue that his allegations are "conclusory" and that he "fails to adequately plead supervisory liability." *Id.* The Court should reject both arguments for substantially similar reasons to those discussed above.[5]

First, the Moving Defendants' calling McDowell's allegations "conclusory" does not make them so. As noted above, McDowell alleges that the Moving Defendants not only participated directly in violating his constitutional rights, but also knowingly approved their subordinates' false police reports that relied on fabricated evidence. *See* Dkt. 1 ¶¶ 20, 22–104; 190–211; *see also Heidelberg*, 503 F. Supp. 3d at 785 (allowing group pleading in similar circumstances). Sister courts have repeatedly held that factual allegations even less specific than McDowell's plausibly state a claim under federal law. *Wilson*, 2020 WL 5748258, at *3; *Carter*, 2018 WL 1726421, at *5; *Heidelberg*, 503 F. Supp. 3d at 798. The Moving Defendants provide no authority suggesting that state law would treat the same allegations as conclusory. Indeed, though they string-cite several cases holding that conclusory allegations cannot support state-law claims, they do not even attempt to compare McDowell's well-pleaded allegations to the facts of those cases. If they did,

---

[5] The Moving Defendants have waived any claim-specific or element-specific arguments regarding McDowell's state-law claims. *Griffin*, 694 F.3d at 822; *see also Campania Mgmt. Co. v. Rooks, Pitts & Poust*, 290 F.3d 843, 852 n.6 (7th Cir. 2022) ("Perfunctory and underdeveloped arguments are waived, especially when, as here, a party fails to develop the factual basis of a claim . . . and, instead, merely draws and relies upon bare conclusions.").

they would see that none addressed allegations remotely like McDowell's or otherwise suggested that his allegations are insufficient under Illinois law.[6]

The Moving Defendants' argument on supervisory liability fares no better. Under Illinois law, to hold a supervisor liable, a plaintiff must plead that the supervisor improperly "appoint[ed], supervis[ed], or cooperat[ed] with" the subordinate employee. *Northrop v. Lopatka*, 610 N.E.2d 806, 810 (Ill. App. Ct. 1993) (quoting Restatement (Second) of Agency § 358(1) (Am. L. Inst. 1958)). Here, as noted above, McDowell has alleged both that the Moving Defendants improperly supervised the other Defendants (by ratifying their misconduct), and also improperly cooperated with those Defendants (by participating in violating McDowell's rights, including by suppressing all evidence of Defendants' misconduct). *See* Dkt. 1 ¶¶ 20, 22–104; 190–211; *see also Heidelberg*, 503 F. Supp. 3d at 785. That is enough. *Chuffo v. Ramsey*, 55 F. Supp. 2d 860, 866 (N.D. Ill. 1999) (holding that supervisor's "failure to train and supervise" subordinates is "directly attributable" to the supervisor under Illinois law).

Neither case the Moving Defendants cite in response supports them. In *Jacobson v. National Railroad Passenger Corp.*, the plaintiff sued a movie producer filming at Union Station because Amtrak and Metra employees had physically removed the plaintiff from set. No. 97 C 6012, 1999 WL 1101299, at *9 (N.D. Ill. Nov. 29, 1999). The court granted the producer's motion to dismiss because the plaintiff did not allege that he coordinated with the Amtrak and Metra

---

[6] *See Littlejohn v. City of Chicago*, No. 25 CV 6195, 2026 WL 63708, at *3 (N.D. Ill. Jan. 8, 2026) (denying dismissal of all claims except for plaintiff's state malicious prosecution claim because plaintiff did not plead favorable termination); *Jones v. Culver Franchising Sys., Inc.*, 12 F. Supp. 3d 1079, 1090 (N.D. Ill. 2013) (dismissing IIED claim based on plaintiffs being "made to feel unwelcome" by defendant); *Johnson v. Frain*, No. 17 C 2000, 2018 WL 2087448, at *6 (N.D. Ill. May 4, 2018) (dismissing "willful and wanton conduct" claim related to a dangerous piece of gym equipment because plaintiff did not plead knowledge); *Kurt v. Platinum Supplemental Ins., Inc.*, No. 19 C 4520, 2021 WL 3109667, at *11 (N.D. Ill. July 22, 2021) (dismissing civil conspiracy claim because plaintiff could not identify any employees of allegedly conspiring companies who had engaged in the scheme).

employees, let alone that he had done so improperly. *Id.* Similarly, in *Northrop v. Lopatka*—a summary-judgment order irrelevant to the court's decision on this motion to dismiss—the plaintiff did not present evidence that the supervisor (a dentist) knew of his assistant's misconduct. 610 N.E.2d at 810. Neither case applies here, as McDowell plausibly alleges that the Moving Defendants not only supervised the other Defendants, but also knowingly approved of their falsified reports and cooperated with them to violate McDowell's rights, including by suppressing exculpatory information. *See* Dkt. 1 ¶¶ 20, 22–104; 190–211.

Again, the Moving Defendants' only response is that the Court should reject McDowell's well-pleaded allegations. That would be improper as explained above. The Court should deny the Moving Defendants' attempts to dismiss McDowell's state-law claims.

**III.     If the Court Grants Dismissal, McDowell Requests Leave to Amend His Complaint.**

Rule 15(a)(2) provides that "court[s] should freely give leave" to amend "when justice so requires." Fed. R. Civ. P. 15(a)(2). Courts ordinarily give plaintiffs at least one opportunity to amend. *See Pension Tr. Fund for Operating Eng'rs v. Kohl's Corp.*, 895 F.3d 933, 941 (7th Cir. 2018). If the Court dismisses McDowell's claims, he asks that the Court grant him an opportunity to amend to cure the identified deficiency.

**CONCLUSION**

For the foregoing reasons, the Court should deny the motion to dismiss.

Dated: May 18, 2026

Respectfully submitted,

ANTONIO MCDOWELL

By: /s/ Aadi Tolappa
*Counsel for Plaintiff*

Jon Loevy
Anand Swaminathan
Steve Art

15

Lyla Wasz-Piper
Aadi Tolappa
LOEVY & LOEVY
311 N Aberdeen St, 3rd Fl
Chicago, IL 60607
(312) 243-5900

16