IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ANTONIO MCDOWELL, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| | ) |
| v. | ) No. 25 C 14635 |
| | ) |
| REYNALDO GUEVARA, BERNARD | ) |
| BRENNAN, RICHARD MAHER, DANIEL | ) |
| ENGEL, HECTOR VERGARA, ALAN | ) |
| PERGANDE, JAMES GILGER, RANDY | ) |
| TROCHE, GERI LYNN YANOW as | ) |
| special representative for the | ) |
| ESTATE OF ERNEST HALVORSEN, | ) |
| EDWARD MINGEY, ROBERT BIEBEL, | ) |
| PHILIP J. CLINE, and the CITY | ) |
| OF CHICAGO. | ) |
| Defendants. | ) |

Memorandum Opinion and Order

On December 21, 1996, someone killed Mario Castro outside his home in the Humboldt Park neighborhood of Chicago. No one witnessed the shooting. Castro's nephew, Alberto Varela, heard gunshots and ran outside to find someone rooting through Castro's pockets as he lay on the ground. Castro's brother-in-law, Juan Medina, also heard gunshots from his nearby porch and also observed someone going through Castro's pockets. Varela approached the perpetrator, who fled after an altercation, firing several shots in Varela's direction. Castro was transported to the hospital, where he was pronounced dead on arrival. Meanwhile, a few blocks from Castro's home, Ruth Morales-Santana's car was stolen at gunpoint. Her car was

1

later found abandoned in a neighboring community, keys still in the ignition.

Nineteen-year-old[1] Antonio McDowell knew nothing of these events. Nevertheless, he was charged with the crimes and spent twenty-three years of a 103-year prison sentence in custody after being convicted of murder, attempted murder, and aggravated carjacking. Ultimately, DNA evidence confirmed that Mr. McDowell was innocent, just as he had maintained throughout his appeals and post-conviction proceedings in both state and federal courts,[2] and he was exonerated and released from custody. This action followed.

Mr. McDowell's complaint alleges that Chicago Police officers and detectives from the Area Five Violent Crimes Division fabricated incriminating evidence against him, suppressed exculpatory evidence,

---

[1] The complaint twice alleges that Mr. McDowell was nineteen and once states that he was twenty-one at the time of the crimes. *Compare* Compl., ECF 1 at ¶¶ 1, 67 with *id*. at ¶ 97. Based on its repetition, I assume that the former allegation is correct, though it makes no difference to my analysis.

[2] *See, e.g.*, *McDowell v. Lemke*, 737 F.3d 476, 484 (7th Cir. 2013). The Seventh Circuit affirmed denial of Mr. McDowell's petition for habeas corpus, concluding that his claims based on "unduly suggestive" photo arrays and lineups had been procedurally defaulted. Mr. McDowell argued that his "actual innocence" warranted relief notwithstanding his procedural default, but the Seventh Circuit concluded that the record lacked the sort of "biological (DNA), or other powerful evidence" required to clear the "extremely high bar" that applies to actual innocence claims. *Id*. at 483. As noted above, DNA evidence would later vindicate McDowell's claim of innocence.

maliciously prosecuted and unlawfully detained him, failed to intervene to prevent the violation of his constitutional rights, and conspired to violate his rights under the Constitution and Illinois common law. The officers' supervisors, including the Area Five Commander, allegedly facilitated and condoned this misconduct, which is part of long-running pattern of constitutional violations and police malfeasance within Area Five. Mr. McDowell claims that the City of Chicago is liable for the deprivation of his constitutional rights under *Monell v. Dep't of Soc. Servs. of the City of N.Y.*, 436 U.S. 658 (1978), and that it is liable for the state law violations on the theory of *respondeat superior*.

The City and several individual defendants have answered the complaint. Defendants Cline, Mingey, and Biebel, the "Supervising Defendants" who allegedly facilitated, condoned, and approved the misconduct Mr. McDowell describes, seek dismissal of all claims against them under Fed. R. Civ. P. 12(b)(6).[3] For the reasons that follow, the motion is denied.

I.

According to the complaint, whose factual allegations I accept for present purposes, nothing in defendants' preliminary investigation into the crimes above pointed to Mr. McDowell as the

---

[3] A Suggestion of Death filed on June 23, 2026, states that Mr. Biebel died on June 17, 2026. I presume that the parties will name an appropriate Special Representative on behalf of his estate and amend the complaint accordingly.

3

perpetrator. In the hours following the incidents, officers interviewed Varela, Morales-Santana, and Medina. Varela and Morales-Santana gave vague descriptions of the suspect as a Black man with a medium complexion in his late-20s who wore a Nike hat and jacket. *See* Compl., ECF 1, at ¶¶ 36, 67. Medina could give no description of the shooter at all. Nevertheless, defendants falsely reported that Medina "would be able to identify the Offender if he sees him again." *Id*. at ¶ 38. Defendants brought Varela and Morales-Santana to the police station to review photo books – which included Mr. McDowell's photo – to try to identify the suspect, but neither made a positive identification. *Id*. at ¶ 39.

Based on physical evidence and witness accounts, defendants suspected that a single individual who lived near where Morales-Santana's car was abandoned had committed both the shooting and carjacking. Although defendants instructed detectives to canvass the area with a composite sketch drawn from the witnesses' general descriptions of the suspect's appearance, the investigative file contains no record of canvassing. In fact, the file shows no investigative work for approximately seven months following the initial steps described above. *See id*. at ¶¶ 41-45.

Fast forward to July 10, 1997, when Mr. McDowell was the victim of a drive-by shooting in the 4800 block of Van Buren Avenue. *Id*. at ¶ 46. (Readers familiar with Chicago will recognize that this is the South Austin area of Chicago, several miles from where Morales-

4

Santana's car was abandoned.) While in the hospital, Mr. McDowell told police that he had not seen his assailant's face. Sometime thereafter, defendants approached Mr. McDowell on the street and asked him to accompany them to the station, telling him they had a lead on who shot him. At the station, officers showed Mr. McDowell several photos, and despite his insistence that he could not identify his shooter, defendant Guevara instructed Mr. McDowell to name a Latino man in one of the photos as the shooter. *Id*. at ¶¶ 47-51. When he refused, Guevara handcuffed Mr. McDowell's hand – still healing from the gunshot – to the wall and left him in the interrogation room for hours, where Guevara periodically returned to ask if he was ready to provide a false identification of Guevara's target. *Id*. at ¶¶ 53-56.

Defendants had no reason to think Mr. McDowell had anything to do with the crimes against Castro, Varela, and Morales-Santana. No weapon or other physical or forensic evidence connected him to the crimes. *Id*. at ¶ 90. Varela and Morales-Santana both described the suspect as medium-complected, but Mr. McDowell has a dark complexion. *Id*. at ¶ 66. Neither Varela nor Morales-Santana had picked Mr. McDowell out of a photo book they were shown shortly after the crimes. *Id*. at ¶ 39. Nevertheless, months later, defendants brought these witnesses, along with Medina (who had previously denied being able to identify Castro's shooter), to the police station, where they had them look through the window of Mr. McDowell's interrogation

5

room and instructed them to identify him as the perpetrator in a live lineup that would follow. *Id*. at ¶¶ 69-70.

Meanwhile, Guevara continued to ask Mr. McDowell if he was "ready" to identify the Latino man Guevara had been pressuring him to point to as his shooter. Compl., ECF 1 at ¶ 53. Mr. McDowell refused. He was then placed in live lineups viewed by Varela, Medina, and Morales-Santana, who—at defendants' direction—identified him as the author of the December 1996 shooting and carjacking. Defendants created reports stating that these witnesses had identified Mr. McDowell, but they failed to note that the witnesses were instructed to do so by detectives who knew Mr. McDowell was innocent. *Id*. at ¶ 74. The Supervising Defendants, for their part, knew that the witness identifications were fabricated and coerced, but they nevertheless approved the false police reports. *Id*. at ¶¶ 73-75.

After the line-up, Guevara tried to extract a false confession from Mr. McDowell. Guevara then told Mr. McDowell that "because he had refused to help the Defendants plant a case on the man they wanted to take down, it was [Mr. McDowell] who would be going to prison for the rest of his life." *Id*. at ¶¶ 76-77.

Mr. McDowell alleges that his conviction "hinged entirely on the Defendants' knowingly fabricated false identification." Compl., ECF 1 at ¶ 91. He also alleges that defendants suppressed exculpatory evidence, including evidence relating to their early investigation that tended to point away from Mr. McDowell. For example, they

6

suppressed early reports indicating that they believed the suspect lived near the location of the abandoned car (which Mr. McDowell did not). They suppressed the fact that neither Varela nor Morales-Santana identified Mr. McDowell from the photo books they were shown shortly after the events. And they suppressed the composite sketch of the suspect that did not match Mr. McDowell's physical characteristics.

## II.

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a complaint must give the defendants fair notice of the basis for the claims asserted, and the claims must be facially plausible. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

The Supervising Defendants argue that the § 1983 claims against them should be dismissed because the complaint does not sufficiently allege their personal involvement in any constitutional violation. The state claims, they argue, should be dismissed because they similarly rely on conclusory allegations. Their arguments are unpersuasive.

As these defendants correctly observe, "[l]iability under § 1983 is direct rather than vicarious; supervisors are responsible

7

for their own acts but not for those of subordinates, or for failing to ensure that subordinates carry out their tasks correctly." *Horshaw v. Casper*, 910 F.3d 1027, 1029 (7th Cir. 2018). But *Horshaw* was decided at summary judgment, and the unobjectionable principle for which the Supervising Defendants cite it does not support dismissal on the allegations here.

The Supervising Defendants' authorities dismissing § 1983 claims under Rule 12(b)(6) are no more persuasive. For example, they cite *Koch v. Westerman*, No. CIV.07-CV-0004-MJR, 2009 WL 249222, at *6 (S.D. Ill. Feb. 2, 2009), in which the court dismissed the plaintiff's § 1983 claim against supervisory officers because "the allegations of the complaint and the attached exhibits indicate that the underlying constitutional violation was complete *before* the supervisors learned of it." *Id*. (original emphasis). That is not the sequence of events Mr. McDowell alleges here. Mr. McDowell attributes specific conduct to Area Five detectives, and he alleges that, as their supervisors and as the Area Five Commander, Mingey, Biebel, and Cline "participated in the misconduct alleged...and facilitated, condoned, approved, and turned a blind eye" to that misconduct. Compl., ECF 1 at ¶ 20. These general allegations are sufficient to put the Supervising Defendants on notice of the nature of Mr. McDowell's claims against them and to plead a plausible claim for supervisory liability. *See Chavez v. Illinois State Police*, 251 F.3d 612, 652 (7th Cir. 2001) (a supervisor is "deemed to have sufficient

personal responsibility if he directed the conduct causing the constitutional violation, or if it occurred with his knowledge or consent."). Mr. McDowell is entitled to discovery to determine the extent of the Supervising Defendants' participation in, knowledge of, and approval of the specific misconduct he alleges.

III.

For the foregoing reasons, the motion to dismiss brought by defendants Cline, Mingey, and Biebel is denied.

**ENTER ORDER:**

_____

**Elaine E. Bucklo**
United States District Judge

Dated: July 23, 2026