**IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS EASTERN DIVISION**

| | | |
|---|---|---|
| ANTONIO MCDOWELL,<br><br>Plaintiff,<br><br>v.<br><br>REYNALDO GUEVARA, BERNARD BRENNAN, RICHARD MAHER, DANIEL ENGEL, HECTOR VERGARA, ALAN PERGANDE, JAMES GILGER, RANDY TROCHE, GERI LYNN YANOW as special representative for the ESTATE OF ERNEST HALVORSEN, EDWARD MINGEY, ROBERT BIEBEL, PHILIP J. CLINE, and the CITY OF CHICAGO.<br><br>Defendants. | ) | Case No.: 25 CV 14635<br><br>Hon. Judge Elaine E. Bucklo<br><br>JURY TRIAL DEMANDED |

**DEFENDANTS CLINE AND MINGEY'S ANSWER TO PLAINTIFF'S <u>COMPLAINT WITH AFFIRMATIVE DEFENSES AND JURY DEMAND</u>**

Defendants Philip J. Cline ("Cline") and Edward Mingey ("Mingey") (collectively "Answering Defendants"), by their attorneys, THE SOTOS LAW FIRM, P.C., for their Answer and Affirmative Defenses to Plaintiff's Complaint, state:

## INTRODUCTION[1]

1. Plaintiff Antonio McDowell was only 19 years old when notorious Chicago Police Detectives Reynaldo Guevara, Ernest Halvorsen, and their co-conspirators at the Chicago Police Department framed him for a 1996 murder and carjacking he did not commit.

**ANSWER:** Answering Defendants deny the allegations of paragraph 1.

[1] Answering Defendants make no answer in response to the "headings" or "subheadings" used by Plaintiff throughout his Complaint as they do not appear to contain any allegations. Rather, these headings appear to be used by Plaintiff to break up his lengthy 215 paragraph Complaint. To the extent answers to these headings and subheadings are required, Answering Defendants deny the allegations contained therein.

2. Plaintiff was wrongly convicted and spent almost 23 years in prison.

**ANSWER:** Answering Defendants, on information and belief, admit that Plaintiff spent almost 23 years in prison. Answering Defendants deny the remaining allegations of paragraph 2.

3. He has spent over half of his life fighting to prove his innocence, which he has maintained from the very beginning.

**ANSWER:** Answering Defendants lack knowledge or information sufficient to admit or deny the allegations in paragraph 3.

4. Plaintiff had nothing to do with the 1996 crimes. Not one piece of physical evidence ever connected Plaintiff to them, and Defendants had no reason to think he was responsible.

**ANSWER:** Answering Defendants, on information and belief, deny the allegations in paragraph 4.

5. Indeed, the physical evidence in the case ruled out Plaintiff and implicated a different perpetrator.

**ANSWER:** Answering Defendants, on information and belief, deny the allegations in paragraph 5.

6. Plaintiff's arrest, prosecution, and conviction were based entirely on false evidence knowingly manufactured by Defendants, including false eyewitness identifications.

**ANSWER:** Answering Defendants deny the allegations in this paragraph to the extent they are directed against them. Answering Defendants lack knowledge or information sufficient to admit or deny the remaining allegations in paragraph 6.

7. Defendants also framed Plaintiff by suppressing evidence of his innocence, including evidence that pointed to the true perpetrator.

**ANSWER:** Answering Defendants deny the allegations in this paragraph to the extent they are directed against them. Answering Defendants lack knowledge or information sufficient to admit or deny the remaining allegations in paragraph 7.

8. The Defendants' misconduct resulting in Plaintiff's wrongful conviction was part of a now well-known pattern of illegal activity perpetrated by Defendant Guevara and the other Defendants.

**ANSWER:** Answering Defendants deny the allegations in this paragraph to the extent they are directed against them. Answering Defendants lack knowledge or information sufficient to admit or deny the remaining allegations in paragraph 8.

9. Plaintiff is one of at least 51 people who have had convictions on murder charges thrown out after being framed in corrupt homicide investigations conducted by Chicago Police officers, including Defendant Guevara, whom the Illinois Appellate Court has called "a malignant blight on the Chicago Police Department and the judicial system."

**ANSWER:** Answering Defendants deny the allegations in this paragraph to the extent they are directed against them. Answering Defendants lack knowledge or information sufficient to admit or deny the remaining allegations in paragraph 9.

10. Cook County courts have found that "Detective Guevara engaged in a pattern and practice of intimidating, threatening, and influencing witnesses in prior homicide investigations," and that Defendant Guevara told "bald-faced lies" during court testimony and had "eliminated any possibility of [] being considered a credible witness in any proceeding."

**ANSWER:** Answering Defendants lack knowledge or information sufficient to admit or deny the allegations in paragraph 10.

11. In court proceedings, Defendant Guevara and his associates have pleaded their Fifth Amendment rights not to incriminate themselves in response to questions about their misconduct as police officers. When asked specifically about investigatory misconduct and knowledge of Plaintiff's innocence—including questions about whether Defendants knowingly fabricated the only evidence used to convict Plaintiff—Defendant Guevara invoked his Fifth Amendment right to remain silent, for fear that he might incriminate himself.

**ANSWER:** Answering Defendants deny the allegations in this paragraph to the extent they are directed against them. Answering Defendants lack knowledge or information sufficient to admit or deny the remaining allegations in paragraph 11.

12. Nearly three decades after Plaintiff's arrest, after Guevara's misconduct came to light, DNA evidence demonstrated Plaintiff's long-asserted innocence. A state court vacated his conviction, and state prosecutors dropped all charges against him.

**ANSWER:** Answering Defendants, on information and belief, admit that a state court vacated Plaintiff's conviction, and state prosecutors dropped all charges against him. Answering Defendants lack knowledge or information sufficient to admit or deny the remaining allegations in paragraph 12.

13. Plaintiff now seeks justice for the harm that the Defendants have caused him and redress for the loss of his liberty and profound hardship he endured and continues to suffer because of the Defendants' misconduct.

**ANSWER:** Answering Defendants deny the allegations in this paragraph to the extent they are directed against them. Answering Defendants lack knowledge or information sufficient to admit or deny the remaining allegations in paragraph 13.

**JURISDICTION AND VENUE**

14. Plaintiff brings this action under 42 U.S.C. § 1983 and Illinois law to redress the Defendants' tortious conduct and their deprivation of his rights secured by the U.S. Constitution.

**ANSWER:** Answering Defendants admit Plaintiff brings this action pursuant to 42 U.S.C. § 1983 and Illinois law. Answering Defendants deny the allegations in this paragraph to the extent they direct allegations of misconduct against them. Answering Defendants lack knowledge or information sufficient to admit or deny the remaining allegations in paragraph 14.

15. This Court has jurisdiction over Plaintiff's federal claims under 28 U.S.C. § 1331 and supplemental jurisdiction over his state-law claims under 28 U.S.C. § 1367.

**ANSWER:** Answering Defendants admit this Court has jurisdiction over Plaintiff's claims. Answering Defendants deny the allegations in this paragraph to the extent they direct allegations of misconduct against them.

16. Venue is proper under 28 U.S.C. § 1391(b) because Plaintiff lives in this judicial district and the events and omissions giving rise to his claims, including the investigation, prosecution, and trial resulting in Plaintiff's conviction, happened here.

**ANSWER:** Answering Defendants admit venue is proper in this Court. Answering Defendants deny the allegations in this paragraph to the extent they direct allegations of misconduct against them. Answering Defendants lack knowledge or information sufficient to admit or deny the remaining allegations in paragraph 16.

## PARTIES

17. Plaintiff Antonio McDowell lives in Chicago, Illinois. He spent more than 23 years wrongfully incarcerated for murder, attempted murder, and aggravated carjacking—crimes he did not commit.

**ANSWER:** Answering Defendants, on information and belief, admit Plaintiff was incarcerated in the Illinois Department of Corrections for convictions for murder, attempted murder, and aggravated carjacking. Answering Defendants lack knowledge or information sufficient to admit or deny where Plaintiff lives or the amount of time he spent in IDOC for murder, attempted murder, and aggravated carjacking. Answering Defendants deny the remaining allegations in paragraph 17.

18. At all relevant times, Defendants Reynaldo Guevara, Bernard Brennan, Richard Maher, Daniel Engel, Hector Vergara, Alan Pergande, James Gilger, Randy Troche, Ernest Halvorsen, Edward Mingey, Robert Biebel, and Philip J. Cline were officers at the Chicago Police Department acting under color of law and within the scope of their employment for the City of Chicago. Plaintiff sues each of these defendants in his individual capacity.

**ANSWER:** Answering Defendants admit they acted under color of law and within the scope of their employment during the investigation of the murder, attempted murder, and aggravated carjacking for which Plaintiff was convicted. Answering Defendants deny the allegations in this paragraph to the extent they direct allegations of misconduct against them. Answering Defendants lack knowledge or information sufficient to admit or deny the remaining allegations in paragraph 18.

19. Geri Lynn Yanow, the Special Representative for Ernest Halvorsen, deceased, is named as a Defendant in her capacity as Special Representative of Ernest Halvorsen, as successor in interest and to defend this action on behalf of Defendant Ernest Halvorsen.

**ANSWER:** Answering Defendants admit that Geri Lynn Yanow was appointed the Special Representative for Halvorsen, who is deceased and is defending this case on his behalf. Answering Defendants, on information and belief, deny the remaining allegations in paragraph 19.

20. At all relevant times, Edward Mingey, Robert Biebel, and Philip J. Cline supervised Defendant Police Officers. Defendants Mingey, Biebel, and Cline participated in the misconduct alleged in this complaint and facilitated, condoned, approved, and turned a blind eye to Defendants' misconduct.

**ANSWER:** Answering Defendants admit that Defendants Mingey, Biebel, and Cline held supervisory roles at Area 5 at the time of the investigation. Answering Defendants deny the remaining allegations in paragraph 20.

21. The City of Chicago is an Illinois municipal corporation that employs or employed the above-named Defendants. At all relevant times, each individual Defendant acted as an agent or employee of the City of Chicago.

**ANSWER:** Answering Defendants, upon information and belief, admit the allegations in paragraph 21.

## FACTS

### Mario Castro Is Murdered and Ruth Morales-Santana Is Robbed

22. Around 3:00 PM on December 21, 1996, Mario Castro was shot and killed just after he exited his car upon arriving home in the Humboldt Park neighborhood. Castro lived in an apartment on the second floor of his building with his nephew, Alberto Varela, among others.

**ANSWER:** Answering Defendants, on information and belief, admit that around 3:00 PM on December 21, 1996, Mario Castro was shot and killed just after he exited his car upon arriving home in the Humboldt Park neighborhood. Answering Defendants upon information and belief deny the remaining allegations in paragraph 22.

23. Castro had returned home from the store and was exiting his car in the garage behind his home when he was confronted by the shooter.

**ANSWER:** Answering Defendants, on information and belief, admit the allegations in paragraph 23.

24. Castro's family and neighbors at and near his house at the time heard screams and gunshots.

**ANSWER:** Answering Defendants, on information and belief, admit that some of Castro's family and neighbors at and near his house at the time heard screams and gunshots. Answering Defendants lack knowledge or information sufficient to admit or deny the remaining allegations in paragraph 24.

25. No one witnessed the shooting.

**ANSWER:** Answering Defendants lack knowledge or information sufficient to admit or deny the remaining allegations in paragraph 25.

26. Upon hearing screams, Castro's nephew Varela ran outside and observed the perpetrator searching Castro's pockets as he lay on the ground.

**ANSWER:** Answering Defendants, on information and belief, admit the allegations in paragraph 26.

27. Varela approached the perpetrator. After an altercation, the perpetrator ran away out the back and down the alley. As Varela chased him, the perpetrator fired several shots that missed. Varela gave up the chase.

**ANSWER:** Answering Defendants, on information and belief, admit the allegations in paragraph 27.

28. Castro's brother-in-law, Juan Medina, also heard the gunshots from his second floor porch and reported seeing the perpetrator going through the victim's pockets.

**ANSWER:** Answering Defendants, on information and belief, admit the allegations in paragraph 28.

29. Castro was transported to Mount Sinai Hospital by ambulance where he was pronounced dead on arrival.

**ANSWER:** Answering Defendants, on information and belief, admit the allegations in paragraph 29.

30. A short time later and just a few blocks away, the perpetrator stole Ruth Morales-Santana's car at gunpoint and fled in Morales-Santana's car.

**ANSWER:** Answering Defendants, on information and belief, admit the allegations in paragraph 30.

31. The stolen car was later found discarded on the street near 1713 North Luna Avenue, with the keys still in the ignition.

**ANSWER:** Answering Defendants, on information and belief, admit the allegations in paragraph 31.

32. The Chicago Police Department responded to the scene of the crimes.

**ANSWER:** Answering Defendants admit the allegations in paragraph 32.

33. Detectives from the Area Five Violent Crimes Division, including Defendants Halvorsen, Guevara, Engel, Vergara, Pergande, and Troche were assigned to the investigation.

**ANSWER:** Answering Defendants, on information and belief, admit that Defendants Halvorsen, Guevara, Engel, and Pergande were assigned to the investigation. Answering Defendants deny the remaining allegations in paragraph 33.

34. Defendant Sergeants Biebel and Mingey were assigned to supervise the investigation. Defendant Cline, as the Commander of Area Five, oversaw the sergeants and detectives assigned to the investigation.

**ANSWER:** Answering Defendants admit that Defendants Biebel, Mingey, and Cline held supervisory roles at Area Five at the time of the investigation. Answering Defendants deny the remaining allegations in paragraph 34.

**Defendants' Investigation Reveals Witnesses Could Not Describe or Identify the Shooter**

35. When potential eyewitnesses—Alberto Varela, Ruth Morales-Santana, and Juan Medina—were interviewed by officers and detectives in the hours after the shooting and carjacking, they described little about the perpetrator.

**ANSWER:** Answering Defendants deny the allegations in paragraph 35.

36. Varela and Morales-Santana could provide only vague descriptions of the perpetrator, such as general descriptions of height and weight, that the perpetrator was a Black man with medium complexion, and that the perpetrator wore a Nike brand hat and jacket.

**ANSWER:** Answering Defendants deny the allegations in paragraph 36.

37. Neither Varela nor Morales-Santana could identify any distinguishing characteristics or facial features of the perpetrator.

**ANSWER:** Answering Defendants deny the allegations in paragraph 37.

38. Juan Medina could give no description of the perpetrator at all. Despite knowing that Medina was unable to describe the shooter, Defendants falsely reported that Medina "would be able to identify the Offender if he sees him again."

**ANSWER:** Answering Defendants deny the allegations in this paragraph to the extent these allegations are directed against them. Answering Defendants lack knowledge or information sufficient to admit or deny the remaining allegations in paragraph 38.

39. Defendants took Varela and Morales-Santana to Area Five where they reviewed photo books in an attempt to identify a suspect. Plaintiff's photo was among those reviewed by Varela and Morales-Santana, but neither witness could make an identification.

**ANSWER:** Answering Defendants, on information and belief, admit that Varela and Morales-Santana came into Area Five and that Varela reviewed photo books in an attempt to identify a suspect. Answering Defendants lack knowledge or information sufficient to admit or deny the remaining allegations in paragraph 39.

40. Because the witnesses were unable to make an identification, the Defendants created a composite sketch of the perpetrator based on the information they did provide.

**ANSWER:** Answering Defendants lack knowledge or information sufficient to admit or deny the allegation that Defendants created a composite sketch of the perpetrator based on the information witnesses provided. Answering Defendants deny the remaining allegations in paragraph 40.

41. Defendants also instructed detectives to canvas the 1700 block of North Luna, where the stolen car had been found.

**ANSWER:** Answering Defendants, on information and belief, admit that detectives canvassed the 1700 block of North Luna, where the stolen car had been found. Answering Defendants lack knowledge or information sufficient to admit or deny the remaining allegations in paragraph 41.

42. Based on physical evidence and witnesses' accounts, Detectives concluded that a single individual had shot Castro, fled on foot, stolen Morales-Santana's car as a getaway car, driven away, and later abandoned the car. They also concluded that the perpetrator likely lived near where the car had been discarded.

**ANSWER:** Answering Defendants, on information and belief, admit they concluded that a single individual had shot Castro, fled on foot, stolen Morales-Santana's car as a getaway, driven away, and later abandoned the car. Answering Defendants lack knowledge or information sufficient to admit or deny the remaining allegations in paragraph 42.

43. Defendants showed witnesses the composite sketch and contemporaneously noted that "Hopefully someone in the 'Hood' will recognize the offender."

**ANSWER:** Answering Defendants lack knowledge or information sufficient to admit or deny the allegation that Defendants showed witnesses a composite sketch. Answering Defendants, on information and belief, admit that it is written on a police report that "Hopefully someone in the 'Hood' will recognize the offender." Answering Defendants deny the remaining allegations in this paragraph to the extent they direct allegations of misconduct against them.

44. Yet Defendants' investigative file lacks any record of the Defendants canvassing the neighborhood to see if anyone recognized the person in the composite—or doing any investigative work in this case—for roughly seven months.

**ANSWER:** Answering Defendants deny that Defendants' investigative file lacks any record of the detectives canvassing the neighborhood. Answering Defendants deny the allegations in this paragraph to the extent they direct allegations of misconduct against them. Answering Defendants lack knowledge or information sufficient to admit or deny the remaining allegations in paragraph 44.

45. There were no leads until July 1997.

**ANSWER:** Answering Defendants lack knowledge or information sufficient to admit or deny the allegations in paragraph 45.

**Seven Months After the Crime, Plaintiff Is Shot in an Unrelated Incident and Refuses to Cooperate in Defendants' Plan to Frame Another Man in the Shooting**

46. On July 10, 1997, almost seven months after the Castro shooting, Plaintiff was the victim of a drive-by shooting on the 4800 block of West Van Buren Street.

**ANSWER:** Answering Defendants lack knowledge or information sufficient to admit or deny the allegations in paragraph 46.

47. While in the hospital, Plaintiff told police he had not seen the face of the person who shot him. Police gave him a copy of a case report and told him to expect a follow-up.

**ANSWER:** Answering Defendants lack knowledge or information sufficient to admit or deny the allegations in paragraph 47. Answering Defendants deny the allegations in this paragraph to the extent they direct allegations of misconduct against them.

48. A short time later, the Defendants found Plaintiff on the street and brought him to the police station.

**ANSWER:** Answering Defendants lack knowledge or information sufficient to admit or deny the allegations in paragraph 48. Answering Defendants deny the allegations in this paragraph to the extent they direct allegations of misconduct against them.

49. The Defendants told Plaintiff they wanted him to come to the Area Five police station because they had a lead as to who shot him.

**ANSWER:** Answering Defendants lack knowledge or information sufficient to admit or deny the allegations in paragraph 49. Answering Defendants deny the remaining allegations in this paragraph to the extent they direct allegations of misconduct against them.

50. After arriving at Area Five, the Defendants showed Plaintiff a photo book and told him it contained a photo of the suspect in his case. When Plaintiff repeated again that he had not seen the person who shot him, Defendants handed Plaintiff four individual photos and asked him whether any of them showed his shooter.

**ANSWER:** Answering Defendants lack knowledge or information sufficient to admit or deny the allegations in paragraph 50. Answering Defendants deny the remaining allegations in this paragraph to the extent they direct allegations of misconduct against them.

51. Despite Plaintiff's adamant assertions that he could not make an identification, Defendant Guevara pointed to a Latino man in one of the individual photos and instructed Plaintiff to falsely implicate him as the person who shot him.

**ANSWER:** Answering Defendants lack knowledge or information sufficient to admit or deny the allegations in paragraph 51.

52. When Plaintiff resisted participating in the Defendants' efforts to frame their chosen target, Defendant Guevara grew agitated and increasingly aggressive.

**ANSWER:** Answering Defendants deny the allegations of this paragraph to the extent they are directed against them. Answering Defendants lack knowledge or information sufficient to admit or deny the remaining allegations in paragraph 52.

53. Defendant Guevara cuffed Plaintiff's hand, which was still healing from being shot just days prior, to a wall in a small interrogation room. Defendant Guevara left Plaintiff in the interrogation room for hours, coming in and out several times to ask if Plaintiff was ready to falsely identify Defendant Guevara's target.

**ANSWER:** Answering Defendants lack knowledge or information sufficient to admit or deny the allegations in paragraph 53.

54. Plaintiff continually refused and begged to leave. But Defendant Guevara told him that he would need to wait.

**ANSWER:** Answering Defendants lack knowledge or information sufficient to admit or deny the allegations in paragraph 54.

55. The Defendants intentionally ignored Plaintiff's pleas for medical care and his complaints of pain to his wrists and left hand where he had been shot so that he would be increasingly vulnerable to the Defendants' threats.

**ANSWER:** Answering Defendants deny the allegations in this paragraph to the extent they are directed against them. Answering Defendants lack knowledge or information sufficient to admit or deny the remaining allegations in paragraph 55.

56. Defendants Guevara and Halvorsen's conduct was part of a now well-known pattern of illegal activity that included framing dozens of innocent people they wished to take down.

**ANSWER:** Answering Defendants deny the allegations in this paragraph to the extent they are directed against them. Answering Defendants lack knowledge or information sufficient to admit or deny the remaining allegations in paragraph 56.

**The Defendants Knowingly Fabricate Photo Identifications to Falsely Implicate Plaintiff in the December Murder and Carjacking**

57. After Plaintiff refused to help frame another man, he suddenly became Defendants' target in the Castro shooting.

**ANSWER:** Answering Defendants deny the allegations in this paragraph to the extent they are directed against them. Answering Defendants lack knowledge or information sufficient to admit or deny the remaining allegations in paragraph 57.

58. The Defendants brought Juan Medina—one of the scene witnesses to the Castro murder and carjacking—to Area Five for a photo identification procedure.

**ANSWER:** Answering Defendants, on information and belief, admit that Defendants Brennan and Guevara brought Juan Medina—one of the scene witnesses to the Castro murder—to Area Five for a photo identification procedure. Answering Defendants deny the remaining allegations in paragraph 58.

59. The Defendants never offered an explanation as to how or why they suddenly thought to show Medina new photos seven months after the murder, or why Defendants believed that the offender would be contained in this specific array out of all the photobooks that detectives had access to.

**ANSWER:** Answering Defendants deny the allegations in this paragraph to the extent they are directed against them. Answering Defendants lack knowledge or information sufficient to admit or deny the remaining allegations in paragraph 59.

60. Additionally, Defendants never explained how Plaintiff suddenly became a suspect in the crimes that had occurred on December 21, 1996.

**ANSWER:** Answering Defendants deny the allegations in this paragraph to the extent they are directed against them. Answering Defendants lack knowledge or information sufficient to admit or deny the remaining allegations in paragraph 60.

61. This is because the only reason he had become a suspect was that he had refused to cooperate in Defendants' efforts to frame another man in the shooting of Plaintiff.

**ANSWER:** Answering Defendants deny the allegations in this paragraph to the extent they are directed against them. Answering Defendants lack knowledge or information sufficient to admit or deny the remaining allegations in paragraph 61.

62. Given that Medina could not give the Defendants a description of the shooter on the day of the Castro murder, the Defendants knew he would be similarly unable to do so seven months later.

**ANSWER:** Answering Defendants deny the allegations in this paragraph to the extent they are directed against them. Answering Defendants lack knowledge or information sufficient to admit or deny the remaining allegations in paragraph 62.

63. Knowing that Medina could not identify the shooter, Defendant Guevara showed him a photo of Plaintiff and instructed him to falsely identify Plaintiff as the perpetrator.

**ANSWER:** Answering Defendants deny that Medina could not identify the shooter. Answering Defendants lack knowledge or information sufficient to admit or deny the remaining allegations in paragraph 63.

64. Defendant Guevara knowingly manufactured Medina's false photo identification and knowingly fabricated an accompanying false police report.

**ANSWER:** Answering Defendants lack knowledge or information sufficient to admit or deny the allegations in paragraph 64.

65. The Defendants then went to the homes of Varela and Morales-Santana. Defendants Guevara and Halvorsen knew that the few details Varela and Morales-Santana had been able to give detectives about the perpetrator at the time of the crime did not match Plaintiff.

**ANSWER:** Answering Defendants deny the allegations in this paragraph to the extent they are directed against them. Answering Defendants lack knowledge or information sufficient to admit or deny the remaining allegations in paragraph 65.

66. For example, both described the perpetrator as having a medium complexion, and Plaintiff had a clearly dark complexion.

**ANSWER:** Answering Defendants lack knowledge or information sufficient to admit or deny the allegations in paragraph 66.

67. For another, Morales-Santana described the perpetrator as roughly 28 years old. Antonio was barely 19 when the crimes occurred.

**ANSWER:** Answering Defendants, on information and belief, deny that Morales-Santana described the perpetrator as "roughly 28 years old." Answering Defendants, on information and belief, admit that McDowell was 19 years-old on December 21, 1996. Answering Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 67.

68. Despite knowing Plaintiff had nothing to do with the Castro murder and carjacking, Defendants Guevara and Halvorsen coerced Varela and Morales-Santana to falsely identify a photo of Plaintiff as the perpetrator.

**ANSWER:** Answering Defendants deny the allegations in this paragraph to the extent they are directed against them. Answering Defendants lack knowledge or information sufficient to admit or deny the remaining allegations in paragraph 68.

**The Defendants Knowingly Fabricate False Lineup Identifications to Frame Plaintiff**

69. The Defendants then brought Medina, Varela, and Morales-Santana to the Area Five Police Station.

**ANSWER:** Answering Defendants lack knowledge or information sufficient to admit or deny the allegations in paragraph 69, in part because "then" is vague and ambiguous as to timeframe, and in part because they lack knowledge or information about Defendant Guevera's actions.

70. When Medina, Varela, and Morales-Santana arrived, the Defendants had the witnesses look through the window of Plaintiff's interrogation room. Despite knowing that there was no evidence linking Plaintiff to the Castro murder and carjacking, the Defendants once again

instructed the witnesses to identify Plaintiff—the person they were shown in the interrogation room—as the perpetrator when the live lineup took place.

**ANSWER:** Answering Defendants deny the allegations in this paragraph to the extent they are directed against them. Answering Defendants lack knowledge or information sufficient to admit or deny the remaining allegations in paragraph 70.

71. Defendant Guevara repeatedly returned to Plaintiff's interrogation room to ask him if he was ready to falsely identify Defendants' suspect as the person who shot him.

**ANSWER:** Answering Defendants lack knowledge or information sufficient to admit or deny the allegations in paragraph 71.

72. Plaintiff, despite his fear and confusion, continued to refuse to falsely implicate the Latino man whom Defendant Guevara continued to pressure him to pick.

**ANSWER:** Answering Defendants lack knowledge or information sufficient to admit or deny the allegations in paragraph 72.

73. The Defendants then placed Plaintiff in live lineups and instructed Varela, Medina, and Morales-Santana—despite knowing their initial descriptions did not match Plaintiff and that Plaintiff had no connection to the crimes in this case—to falsely pick Plaintiff as the perpetrator of the December shooting and carjacking.

**ANSWER:** Answering Defendants deny the allegations in this paragraph to the extent they are directed against them. Answering Defendants lack knowledge or information sufficient to admit or deny the remaining allegations in paragraph 73.

74. The Defendants then fabricated reports falsely claiming that Varela, Medina, and Morales-Santana had legitimately identified Plaintiff as the person who killed Castro and stole Morales-Santana's car.

**ANSWER:** Answering Defendants deny the allegations in this paragraph to the extent they are directed against them. Answering Defendants lack knowledge or information sufficient to admit or deny the remaining allegations in paragraph 74.

75. Supervising Defendants Mingey, Biebel, and Cline knew that the Detective Defendants had coerced and fabricated the false identifications of Plaintiff made by Varela,

Medina, and Morales-Santana despite the witnesses' protestations that they could not make an identification. Nonetheless, the supervising Defendants approved the false police reports—knowing their falsity.

**ANSWER:** Answering Defendants deny the allegations in paragraph 75.

76. Following the line-up, Defendant Guevara tried to extract a false confession from Plaintiff. Plaintiff refused and denied any knowledge of the crimes that Guevara accused him of.

**ANSWER:** Answering Defendants lack knowledge or information sufficient to admit or deny the allegations in paragraph 76.

77. Defendant Guevara told Plaintiff that because he had refused to help the Defendants plant a case on the man they wanted to take down, it was Plaintiff who would be going to prison for the rest of his life.

**ANSWER:** Answering Defendants lack knowledge or information sufficient to admit or deny the allegations in paragraph 77.

**After Knowingly Manufacturing False Witness Identifications of Plaintiff, the Defendants Suppress Evidence of Plaintiff's Innocence**

78. Until the Defendants decided to falsely pin the Castro murder and carjacking on Plaintiff, the information gathered by detectives pointed to a different suspect.

**ANSWER:** Answering Defendants deny the allegations in this paragraph to the extent they are directed against them. Answering Defendants lack knowledge or information sufficient to admit or deny the remaining allegations in paragraph 78.

79. After the Defendants decided to frame Plaintiff seven months after the crime, the Defendants suppressed all material exculpatory and impeaching evidence.

**ANSWER:** Answering Defendants deny the allegations in this paragraph to the extent they are directed against them. Answering Defendants lack knowledge or information sufficient to admit or deny the remaining allegations in paragraph 79.

80. Varela and Morales-Santana were shown photo books on the day of the crime and neither witness could make an identification. The photo books contained a photo of Plaintiff,

meaning that in Varela and Morales-Santana's first attempt to identify the perpetrator, they saw Plaintiff's photo and did not identify him.

**ANSWER:** Answering Defendants deny the allegations in paragraph 80.

81. After selecting Plaintiff as their target seven months after the crime, the Defendants suppressed the initial negative identifications, as well as the photobooks on which those negative identifications were based.

**ANSWER:** Answering Defendants deny the allegations in this paragraph to the extent they are directed against them. Answering Defendants lack knowledge or information sufficient to admit or deny the remaining allegations in paragraph 81.

82. The initial negative identifications and photobooks were both exculpatory and impeaching to the later knowingly fabricated identifications.

**ANSWER:** Answering Defendants deny the allegations in this paragraph to the extent they are directed against them. Answering Defendants lack knowledge or information sufficient to admit or deny the remaining allegations in paragraph 82.

83. Similarly, during the initial police investigation, detectives concluded the perpetrator must have lived near where the carjacked car had been abandoned.

**ANSWER:** Answering Defendants deny the allegations in this paragraph to the extent they are directed against them. Answering Defendants lack knowledge or information sufficient to admit or deny the remaining allegations in paragraph 83.

84. Later in their investigation, after Plaintiff became the Defendants' target, they learned that Plaintiff did not live near the location of the abandoned getaway car, so they suppressed evidence showing that they believed the perpetrator lived in the vicinity of the discarded car. They also suppressed all information related to their investigation between December 1996 and July 1997, including in the neighborhood where the car was abandoned.

**ANSWER:** Answering Defendants deny the allegations in this paragraph to the extent they are directed against them. Answering Defendants lack knowledge or information sufficient to admit or deny the remaining allegations in paragraph 84.

85. During the initial investigation, police had created a composite sketch of the perpetrator. The police composite sketch did not match Plaintiff, so after the Defendants knowingly manufactured evidence against him they suppressed the exculpatory composite sketch.

**ANSWER:** Answering Defendants deny the allegations in this paragraph to the extent they directed allegations of misconduct against them. Answering Defendants lack knowledge or information sufficient to admit or deny the remaining allegations in paragraph 85.

86. Defendants never turned the composite sketch over to the State's Attorney's Office or to Plaintiff's trial counsel.

**ANSWER:** Answering Defendants lack knowledge or information sufficient to admit or deny the allegations in paragraph 86.

87. To this day, the composite sketch has never been produced and appears nowhere in the homicide file.

**ANSWER:** Answering Defendants lack knowledge or information sufficient to admit or deny the allegations in paragraph 87.

**Plaintiff's Wrongful Conviction and Imprisonment**

88. Plaintiff has maintained his innocence throughout the entirety of his case.

**ANSWER:** Answering Defendants lack knowledge or information sufficient to admit or deny the allegations in paragraph 88.

89. As a result of Defendants' misconduct and based on the false evidence they knowingly manufactured, Defendants caused Plaintiff to be prosecuted and convicted for the murder of Mario Castro and the aggravated vehicular carjacking of Ruth Morales-Santana.

**ANSWER:** Answering Defendants deny the allegations in this paragraph to the extent they are directed against them. Answering Defendants lack knowledge or information sufficient to admit or deny the remaining allegations in paragraph 89.

90. No weapon or other physical or forensic evidence connected Plaintiff to either crime—and Defendants knew this.

**ANSWER:** Answering Defendants deny the allegations in this paragraph to the extent they are directed against them. Answering Defendants lack knowledge or information sufficient to admit or deny the remaining allegations in paragraph 90.

91. At trial, the State's case hinged entirely on the Defendants' knowingly fabricated false identifications.

**ANSWER:** Answering Defendants deny the allegations in this paragraph to the extent they are directed against them. Answering Defendants lack knowledge or information sufficient to admit or deny the remaining allegations in paragraph 91.

92. The Defendants suppressed all evidence that implicated a different perpetrator—including the initial witness descriptions that did not match Plaintiff, the police composite sketch that did not match Plaintiff, Varela and Morales-Santana's first negative identification of Plaintiff, the photobooks Varela and Morales-Santana viewed in making those negative identifications, evidence the Defendants collected showing the true perpetrator lived many miles from where Plaintiff lived, and all documentation of their investigation between December 1996 and July 1997—ensuring Plaintiff's wrongful conviction.

**ANSWER:** Answering Defendants deny the allegations in this paragraph to the extent they direct allegations of misconduct against them. Answering Defendants lack knowledge or information sufficient to admit or deny the remaining allegations in paragraph 92.

93. Plaintiff was found guilty of first-degree murder, attempted murder, and aggravated vehicular hijacking.

**ANSWER:** Answering Defendants, on information and belief, admit the allegations in paragraph 93.

94. At Plaintiff's sentencing—a time when people are incentivized to show remorse and ask for forgiveness to avoid harsh sentences—Plaintiff stood by the truth of his innocence:

> I'm sorry to whatever happened to that man, but I didn't kill him. I was framed. Police know they framed me. Because when they arrested me I was a victim. I got to speak. You all know I was a victim. I was a victim. I got shot at [a] driveby. When they arrested me I was the victim. They placed me in the lineup. I am talking about I ain't have no knowledge of [] Castro, his family. I didn't murder him.

> Putting me under the jail [is] not going to make the family happy. Because the killer is still at large. You all, I mean I can't, I don't even know what to say. I know I didn't kill that man. That is not my MO. That is all I have to say.

**ANSWER:** Answering Defendants lack knowledge or information sufficient to admit or deny the allegations in paragraph 94.

95. On April 26, 1999, the Court sentenced Plaintiff to 103 years in prison.

**ANSWER:** Answering Defendants, on information and belief, admit the allegations in paragraph 95.

96. Without Defendants' intentional fabrication and suppression of material exculpatory and impeaching evidence, Plaintiff would never have been convicted.

**ANSWER:** Answering Defendants deny the allegations in this paragraph to the extent they are directed against them. Answering Defendants lack knowledge or information sufficient to admit or deny the remaining allegations in paragraph 96.

97. Plaintiff was just 21 years old when the Defendants framed him. The following decades of his life were consumed by the horror of wrongful imprisonment.

**ANSWER:** Answering Defendants deny the allegations in this paragraph to the extent they are directed against them. Answering Defendants lack knowledge or information sufficient to admit or deny the remaining allegations in paragraph 97.

98. Because of the Defendants' misconduct, Plaintiff's opportunity to grow older with his family and make a life with them was taken away. Plaintiff's relationship with his family and friends was severely harmed.

**ANSWER:** Answering Defendants deny the allegations in this paragraph to the extent they are directed against them. Answering Defendants lack knowledge or information sufficient to admit or deny the remaining allegations in paragraph 98.

99. Plaintiff was stripped of his young adulthood, much of his full adulthood, and deprived of opportunities to gain an education, to engage in meaningful labor, to develop skills and a career, and to pursue his interests and passions.

**ANSWER:** Answering Defendants deny the allegations in this paragraph to the extent they are directed against them. Answering Defendants lack knowledge or information sufficient to admit or deny the allegations in paragraph 99.

100. The Defendants' misconduct deprived Plaintiff of all the basic pleasures of human experience, which all free people enjoy as a matter of right, including the freedom to live one's life as an autonomous human being.

**ANSWER:** Answering Defendants deny the allegations in this paragraph to the extent they are directed against them. Answering Defendants lack knowledge or information sufficient to admit or deny the remaining allegations in paragraph 100.

101. Plaintiff never knew whether the truth would come out or whether he would ever be exonerated for crimes he had not committed.

**ANSWER:** Answering Defendants deny the allegations in this paragraph to the extent they are directed against them. Answering Defendants lack knowledge or information sufficient to admit or deny the allegations in paragraph 101.

102. Plaintiff spent almost 23 years in prison and has spent well over half his life trying to clear his name.

**ANSWER:** Answering Defendants admit that Plaintiff spent almost 23 years in prison. Answering Defendants deny the allegations in this paragraph to the extent they direct allegations of misconduct against them. Answering Defendants lack knowledge or information sufficient to admit or deny the remaining allegations in paragraph 102.

103. In addition to the severe trauma of wrongful imprisonment and Plaintiff's loss of liberty, the Defendants' misconduct continues to cause Plaintiff extreme physical and psychological pain and suffering, humiliation, constant fear, anxiety, deep depression, rage, and other physical and psychological effects.

**ANSWER:** Answering Defendants deny the allegations in this paragraph to the extent they are directed against them. Answering Defendants lack knowledge or information sufficient to admit or deny the remaining allegations in paragraph 103.

104. Plaintiff was branded a murderer—causing him to suffer profound reputational harm as a result.

**ANSWER:** Answering Defendants deny the allegations in this paragraph to the extent they are directed against them. Answering Defendants lack knowledge or information sufficient to admit or deny the allegations in paragraph 104.

## Plaintiff's Exoneration

105. Plaintiff steadfastly proclaimed his innocence throughout the entire 23 years he was incarcerated and the time he has spent since then fighting the false charges against him.

**ANSWER:** Answering Defendants deny the allegations in this paragraph to the extent they are directed against them. Answering Defendants lack knowledge or information sufficient to admit or deny the allegations in paragraph 105.

106. Plaintiff has always maintained that he was framed by Defendants. His contemporaneous outcry that he was being framed is now corroborated as a pattern of misconduct by Defendants.

**ANSWER:** Answering Defendants deny the allegations in this paragraph to the extent they are directed against them. Answering Defendants lack knowledge or information sufficient to admit or deny the remaining allegations in paragraph 106.

107. As the extent of Defendant Guevara's rampant corruption began coming to light, Plaintiff filed a petition for relief from the criminal court's judgment and to vacate his convictions.

**ANSWER:** Answering Defendants lack knowledge or information sufficient to admit or deny the allegations in paragraph 107.

108. During the post-conviction proceedings, the Cook County State's Attorney's Office asked Plaintiff to consent to DNA testing.

**ANSWER:** Answering Defendants lack knowledge or information sufficient to admit or deny the allegations in paragraph 108.

109. The person who murdered Castro left touch DNA on Castro's pants when rummaging through Castro's body and clothing.

**ANSWER:** Answering Defendants lack knowledge or information sufficient to admit or deny the allegations in paragraph 109.

110. The DNA left on the victim was collected at the time of the crime in 1996 and preserved.

**ANSWER:** Answering Defendants, on information and belief, admit that the victim's pants were placed into evidence. Answering Defendants lack knowledge or information sufficient to admit or deny the remaining allegations in paragraph 110.

111. When the State's Attorney's Office asked Plaintiff to consent to testing his DNA against the perpetrator's DNA left on Castro's clothing, Plaintiff enthusiastically agreed and voluntarily gave a buccal swab the same day.

**ANSWER:** Answering Defendants lack knowledge or information sufficient to admit or deny the allegations in paragraph 111.

112. The perpetrator's DNA did not match Plaintiff and wholly excluded him as the killer.

**ANSWER:** Answering Defendants deny the allegations in paragraph 112.

113. Following agreement by the State's Attorney's Office and an evidentiary hearing, the Cook County Circuit Court vacated Plaintiff's convictions

**ANSWER:** Answering Defendants, on information and belief, admit that Plaintiff's convictions were vacated. Answering Defendants lack knowledge or information sufficient to admit or deny the remaining allegations in paragraph 113.

114. The State dismissed all charges against Plaintiff.

**ANSWER:** Answering Defendants, on information and belief, admit the allegations in paragraph 114.

115. At the time of his exoneration, Plaintiff had been fighting the false charges against him for more than half of his life.

**ANSWER:** Answering Defendants deny the allegations in this paragraph to the extent they are directed against them. Answering Defendants lack knowledge or information sufficient to admit or deny the allegations in paragraph 115.

**Chicago's Policy and Practice of Wrongly Convicting Innocent People in Violation of the Constitution**

116. The City of Chicago and the Chicago Police Department are responsible, by virtue of their official policies, for inflicting miscarriages of justice in scores of criminal cases like the one endured by Plaintiff.

**ANSWER:** Answering Defendants deny the allegations in this paragraph to the extent they are directed against them. Answering Defendants lack knowledge or information sufficient to admit or deny the remaining allegations in paragraph 116.

117. Since the 1980s, no fewer than 100 cases have come to light in which Chicago police officers fabricated false evidence and/or suppressed exculpatory evidence to cause the convictions of innocent people for serious crimes they did not commit.

**ANSWER:** Answering Defendants deny the allegations in this paragraph to the extent they are directed against them. Answering Defendants lack knowledge or information sufficient to admit or deny the remaining allegations in paragraph 117.

118. These cases include many in which Chicago police officers used the same tactics Defendants employed against Plaintiff in this case, including but not limited to fabricating evidence, concealing exculpatory evidence, coercing confessions and statements through physical and psychological abuse, manipulating witnesses to influence eyewitness identifications and testimony, and using other tactics to secure the arrest, prosecution, and conviction of a person without probable cause or regard for the person's actual guilt.

**ANSWER:** Answering Defendants deny the allegations in this paragraph to the extent they are directed against them. Answering Defendants lack knowledge or information sufficient to admit or deny the remaining allegations in paragraph 118.

119. At all relevant times, members of the Chicago Police Department, including Defendants in this action, routinely fabricated and manipulated identification procedures to procure suspect identifications they knew to be inaccurate.

**ANSWER:** Answering Defendants deny the allegations in this paragraph to the extent they are directed against them. Answering Defendants lack knowledge or information sufficient to admit or deny the remaining allegations in paragraph 119.

120. At all relevant times, members of the Chicago Police Department, including the Defendants in this action, systematically suppressed exculpatory and/or impeaching material by intentionally secreting discoverable reports, memos, and other information. This concealed material was kept in files that were maintained only at the Chicago Police Department and never disclosed to criminal defendants, their attorneys, or state prosecutors. As a matter of widespread custom and practice, these clandestine files were withheld from the State's Attorney's Office and from criminal defendants, and they were routinely destroyed or hidden at the close of the investigation rather than being preserved as part of the official file.

**ANSWER:** Answering Defendants deny the allegations in this paragraph to the extent they are directed against them. Answering Defendants lack knowledge or information sufficient to admit or deny the remaining allegations in paragraph 120.

121. Consistent with the municipal policy and practice described in the preceding paragraph, employees of the City of Chicago, including Defendants, concealed exculpatory evidence from Plaintiff.

**ANSWER:** Answering Defendants deny the allegations in this paragraph to the extent they are directed against them. Answering Defendants lack knowledge or information sufficient to admit or deny the remaining allegations in paragraph 121.

122. The existence of this policy and practice of suppressing exculpatory and/or impeaching material in clandestine files was established and corroborated in the cases of *Rivera v. Guevara*, No. 12-cv-4428 (N.D. Ill.), *Fields v. City of Chicago*, No. 10-cv-1168 (N.D. Ill.), and *Jones v. City of Chicago*, No. 87-cv-2536 (N.D. Ill.), among others.

**ANSWER:** Answering Defendants lack knowledge or information sufficient to admit or deny the allegations in paragraph 122.

123. The policies and practices of file suppression exposed in Fields were in place from the 1980s through the 2000s, including at the time of the investigation at issue here.

**ANSWER:** Answering Defendants lack knowledge or information sufficient to admit or deny the allegations in paragraph 123.

124. In addition, a set of clandestine files related to Area 5 homicides—the same detective division involved in this case—was found in the case of *Rivera v. Guevara*, No. 12-cv-4428 (N.D. Ill.). Those files, for a period in the 1980s and 1990s, contained exculpatory and impeaching evidence not turned over to criminal defendants.

**ANSWER:** Answering Defendants lack knowledge or information sufficient to admit or deny the allegations in paragraph 124.

125. The policy and practice of suppressing exculpatory and/or impeaching material evidence was alive and well at all relevant times, including at the Area Five Detective Division during the investigation at issue here.

**ANSWER:** Answering Defendants deny the allegations in this paragraph to the extent they are directed against them. Answering Defendants lack knowledge or information sufficient to admit or deny the remaining allegations in paragraph 125.

126. The City of Chicago and the Chicago Police Department also routinely used illegal tactics, including torture, physical coercion, and psychological coercion, to extract involuntary and false confessions and statements from suspects and witnesses. There are over 250 documented cases of Chicago police officers using torture and coercion to illegally obtain confessions in homicide cases. The City had notice of this widespread practice of procuring false and coerced confessions long before the events at issue in this case.

**ANSWER:** Answering Defendants deny the allegations in this paragraph to the extent they are directed against them. Answering Defendants lack knowledge or information sufficient to admit or deny the remaining allegations in paragraph 126.

127. Moreover, the City of Chicago and the Chicago Police Department routinely failed to investigate cases where Chicago police detectives recommended charging an innocent person with a serious crime. No Chicago police officer has ever been disciplined for misconduct in any of those cases.

**ANSWER:** Answering Defendants deny the allegations in this paragraph to the extent they are directed against them. Answering Defendants lack knowledge or information sufficient to admit or deny the remaining allegations in paragraph 127.

128. Prior to and during the period in which Plaintiff was falsely charged and convicted, the City of Chicago also operated a dysfunctional disciplinary system for Chicago police officers accused of serious misconduct. The City almost never imposed significant discipline against officers accused of violating the civil and constitutional rights of members of the public. Further, the disciplinary apparatus had no mechanism for identifying police officers who were repeatedly accused of engaging in misconduct.

**ANSWER:** Answering Defendants deny the allegations in this paragraph to the extent they are directed against them. Answering Defendants lack knowledge or information sufficient to admit or deny the remaining allegations in paragraph 128.

129. For instance, multiple witnesses have come forward with evidence that Defendant Guevara was part of Miedzianowski's criminal enterprise. Guevara and Miedzianowski worked together in the CPD gang crimes unit before Guevara became homicide detective. Guevara used his status as a detective to advance the criminal drug enterprise he participated in with Miedzianowski and to pressure drug dealers who did not do their bidding. Guevara's assistance included working with Miedzianowski to pin murders on innocent men.

**ANSWER:** Answering Defendants lack knowledge or information sufficient to admit or deny the allegations in paragraph 129.

130. In the case of *Klipfel v. Bentsen*, No. 94-cv-6415 (N.D. Ill), a federal jury in Chicago returned a verdict against the City, finding it responsible for maintaining both a code of

silence and a deeply flawed disciplinary system. This system allowed Chicago police officers (operating out of the very same police facilities as Defendants in this case) to operate a far-reaching, long-running criminal enterprise that included the subversion of homicide investigations.

**ANSWER:** Answering Defendants lack knowledge or information sufficient to admit or deny the allegations in paragraph 130.

131. The *Klipfel* plaintiffs were two former federal agents from the Bureau of Alcohol, Tobacco and Firearms who brought allegations of rampant criminal misconduct among gang crimes officers to the attention of CPD officials. The evidence in that litigation included: Philip Cline, an Area Commander and future Chief of Detectives and Superintendent, personally filed two Internal Affairs complaints against Miedzianowski for tampering in homicide investigations, that resulted in no discipline whatsoever; and Raymond Risley, an assistant deputy superintendent and head of Internal Affairs, not only knew about misconduct in homicide cases but actively participated in efforts to subvert the disciplinary investigation into Miedzianowski that was at the heart of the Klipfel litigation.

**ANSWER:** Answering Defendants lack knowledge or information sufficient to admit or deny the allegations in paragraph 131.

132. As a matter of both policy and practice, leaders of the Chicago Police Department and elected officials in Chicago have acknowledged a code of silence within the Chicago Police Department, condoned and facilitated by municipal policy makers and department supervisors. Under the code of silence, officers refused to report and otherwise lied about their colleagues' misconduct, including the misconduct at issue in this case.

**ANSWER:** Answering Defendants deny the allegations in this paragraph to the extent they are directed against them. Answering Defendants lack knowledge or information sufficient to admit or deny the remaining allegations in paragraph 132.

133. As a result of the City of Chicago's established practices, officers (including

Defendants here) have come to believe they may violate civilians' civil rights and cause innocent people to be charged with serious crimes without fear of adverse circumstances. The practices that enable this belief include failing to track and identify police officers repeatedly accused of serious misconduct, failing to investigate cases where police were involved in a wrongful charge or conviction, failing to discipline officers accused of serious misconduct, and facilitating a code of silence within the Chicago Police Department. As a result of these policies and practices of the City of Chicago, members of the Chicago Police Department act with impunity when they violate the constitutional and civil rights of citizens.

**ANSWER:** Answering Defendants deny the allegations in this paragraph to the extent they are directed against them. Answering Defendants lack knowledge or information sufficient to admit or deny the remaining allegations in paragraph 133.

134. This belief extends to the Defendants in this case. By way of example, Defendant Guevara has a long history of engaging in the kind of investigative misconduct that occurred in this case. There are dozens of known cases in which Guevara and other Chicago police officers engaged in serious investigative misconduct similar to that described above. They engaged in such misconduct because they had no reason to fear the City of Chicago and its police department would ever discipline them for doing so.

**ANSWER:** Answering Defendants deny the allegations in this paragraph to the extent they are directed against them. Answering Defendants lack knowledge or information sufficient to admit or deny the remaining allegations in paragraph 134.

135. The City of Chicago and its police department also failed in the years before Plaintiff's wrongful conviction to provide adequate training to Chicago police detectives and other officers in many areas, including the following:

a. The conduct of live lineup, photographic, and other identification procedures.

b. The constitutional requirement to disclose exculpatory evidence, including how to identify such evidence and how to ensure such evidence is made part of the criminal proceeding.

c. The need to refrain from physical and psychological abuse, and manipulative and coercive conduct, in relation to suspects and witnesses.

d. The risks of wrongful conviction and the steps police officers should take to minimize risks.

e. The risks of engaging in tunnel vision during investigation.

f. The need for full disclosure, candor, and openness on the part of all officers who participate in the police disciplinary process, both as witnesses and as accused officers, and the need to report misconduct committed by fellow officers.

**ANSWER:** Answering Defendants deny the allegations in this paragraph to the extent they are directed against them. Answering Defendants lack knowledge or information sufficient to admit or deny the remaining allegations in paragraph 135.

136. The need for police officers to be trained in these areas was and remains obvious. The City's failure to train Chicago police officers as alleged in the preceding paragraph caused Plaintiff's wrongful conviction and his injuries.

**ANSWER:** Answering Defendants deny the allegations in this paragraph to the extent they are directed against them. Answering Defendants lack knowledge or information sufficient to admit or deny the remaining allegations in paragraph 136.

137. The City's failure to train, supervise, and discipline its officers, including the individual defendants in this case, condones, ratifies, and sanctions the kind of misconduct that Defendants committed against Plaintiff.

**ANSWER:** Answering Defendants deny the allegations in this paragraph to the extent they are directed against them. Answering Defendants lack knowledge or information sufficient to admit or deny the remaining allegations in paragraph 137.

138. The City of Chicago and final policymaking officials within the Chicago Police Department failed to act to remedy the patterns of abuse described in the preceding paragraphs, despite actual knowledge of the pattern of misconduct. They thereby perpetuated the unlawful practices and ensured no action would be taken (independent of the judicial process) to remedy Plaintiff's ongoing injuries.

**ANSWER:** Answering Defendants deny the allegations in this paragraph to the extent they are directed against them. Answering Defendants lack knowledge or information sufficient to admit or deny the remaining allegations in paragraph 138.

139. The policies and practices described in the foregoing paragraphs were also approved by the City of Chicago policymakers, who were deliberately indifferent to the violations of constitutional rights described in this complaint.

**ANSWER:** Answering Defendants deny the allegations in this paragraph to the extent they are directed against them. Answering Defendants lack knowledge or information sufficient to admit or deny the remaining allegations in paragraph 139.

**Defendant Guevara's History of Framing Innocent Persons**

140. As a result of the Chicago Police Department's policies and practices described above, Defendant Guevara has framed dozens of innocent people over the span of two decades. These victims have lodged independent accusations of similar misconduct against Defendant Guevara.

**ANSWER:** Answering Defendants lack knowledge or information sufficient to admit or deny the allegations in paragraph 140.

141. As of the filing of this complaint, 51 people have had their convictions thrown out because of Defendant Guevara's misconduct. They are Jacques Rivera, Juan Johnson, Jose Montanez, Armando Serrano, Jorge Pacheco, Roberto Almodovar, William Negron, Jose Maysonet, Angel Rodriguez, Santos Flores, Arturo DeLeon-Reyes, Gabriel Solache, Ariel Gomez, Xavier Arcos, Ricardo Rodriguez, Robert Bouto, Thomas Sierra, Geraldo Iglesias,

Demetrius Johnson, David Gecht, Richard Kwil, Ruben Hernandez, Juan Hernandez, Rosendo Hernandez, Ray Munoz, David Lugo, Carlos Andino, Daniel Rodriguez, Jaime Rios, Jose Cruz, Marilyn Mulero, Nelson Gonzalez, Johnny Flores, Adolfo Rosario, Eruby Abrego, Jeremiah Cain, Edwin Davila, Alfredo Gonzalez, Gamalier Rivera, Fabian Santiago, Madeline Mendoza, John Martinez, Jose Tinajero, Thomas Kelly, Louis Robinson, Tony Gonzalez, Edwin Ortiz, Oscar Soto, David Krueger, Tyrece Williams, and now Plaintiff Antonio McDowell. These men and women served hundreds of years in prison for crimes they did not commit.

**ANSWER:** Answering Defendants lack knowledge or information sufficient to admit or deny the allegations in paragraph 141.

142. Guevara has a long history of engaging in precisely the kind of investigative misconduct that occurred in this case, including knowingly fabricating false eyewitness identifications, manipulating witnesses, fabricating evidence, suppressing exculpatory evidence, and coercing false confessions and false statements from suspects and witnesses, and using physical and psychological violence, in the course of maliciously prosecuting innocent people. In addition to the cases in which individuals have been exonerated, there are dozens of other identified cases in which Defendant Guevara engaged in serious investigative misconduct.

**ANSWER:** Answering Defendants lack knowledge or information sufficient to admit or deny the allegations in paragraph 142.

143. Given this extensive history of misconduct and the City of Chicago's failure to meaningfully supervise or discipline Guevara and others, it is apparent that Guevara engaged in such misconduct because he had every reason to believe the City of Chicago and its police department condoned his behavior.

**ANSWER:** Answering Defendants deny the allegations in this paragraph to the extent they are directed against them. Answering Defendants lack knowledge or information sufficient to admit or deny the remaining allegations in paragraph 143.

144. Repeatedly, Guevara has invoked his Fifth Amendment right to not answer questions about allegations against him because truthful responses could subject him to criminal liability. Guevara has refused, for example, to respond to allegations that he manipulated dozens of witnesses to provide false identifications; fabricated false evidence; suppressed exculpatory evidence, including documentary evidence; tortured and abused suspects and witnesses and coerced false statements from them; and committed the misconduct detailed below.

**ANSWER:** Defendants, on information and belief, admit that Defendant Guevara has asserted his Constitutional right under the Fifth Amendment in response to questions regarding allegations of misconduct. Answering Defendants lack knowledge or information sufficient to admit or deny the remaining allegations in paragraph 144.

145. A few examples of Defendant Guevara's misconduct include:

a. Bill Dorsch is a former Chicago police detective. While serving with the Chicago Police Department, Dorsch was assigned to investigate a murder. Several months after the murder occurred, Defendant Guevara brought to the police station two juveniles purporting to have witnessed a shooting and recorded the license place of the shooter. Based on the information provided, Detective Dorsch created a photo array for the juveniles in an attempt to identify the shooter. While the first juvenile was viewing the photo array, and before he identified any of the photographs, Defendant Guevara pointed to the suspect's photo and told the juvenile "That's him." The juvenile then agreed with Guevara, identifying the flagged individual as the shooter. Following this, Dorsch directed Defendant Guevara to leave the room and had the other juvenile view the same photo array; this juvenile was unable to make any identification. Based on the first juvenile's identification, the suspect was charged with murder. Subsequently, Dorsch spoke to the two juveniles outside

of Defendant Guevara's presence. The juveniles admitted that they were paid to falsely claim that the suspect was the person responsible for the shooting. After prosecutors spoke to the two juveniles, the suspect was released.

b. Defendant Guevara's activities have drawn the interest of federal law enforcement officers. In 2001, the FBI authored a special report detailing the criminal activity of Chicago police officer Joseph Miedzianowski and his associates, including Defendant Guevara. The report details that Defendant Guevara, while acting in his capacity as a police officer, would apprehend drug and gun dealers and then allow them to "buy their way of trouble." According to the report, Guevara also took bribes to alter both positive and negative lineups of murder suspects. Finally, the report states that Guevara, using an attorney as a conduit, would receive cash in exchange for the ultimate dismissal of murder cases he investigated.

c. In 1982, Defendant Guevara and another officer arrested and physically assaulted Annie Turner for smoking on a bus. Guevara called her a "bitch" and pushed her out of the back door of the bus. He twisted her arm, threatened to "snap" it, and handcuffed her so tightly that her skin broke. He also hit her across the face with a metal bracelet he was wearing and called her a "nigger bitch." Turner sought medical treatment and filed a complaint with the Chicago Police Department's Office of Professional Standards (OPS).

d. In 1982, Defendant Guevara and three other officers broke through Almarie Lloyd's locked front door and conducted a warrantless search of her home.

When Lloyd asked who they were, she was told to shut up. The officers terrified Lloyd, her brother, and her two children, and left the home in shambles. Lloyd filed a complaint with OPS the next day.

e. In 1983, Defendant Guevara and other officers forcibly removed Leshurn Hunt from his home and handcuffed him to a ring in the wall at the police station where he was beaten on the head, face, and body until he confessed to murder and robbery. Hunt was detained for approximately 23 hours and deprived of food, water, and sleep until he confessed. The criminal court suppressed Hunt's confession, and a jury returned a favorable verdict in a related civil rights action against the City of Chicago on Hunt's claim of excessive detention.

f. In 1984, Defendant Guevara and other officers physically assaulted Graciela Flores and her 13-year-old sister, Ana, during a search of their home. During the search, officers did not identify themselves as police. Guevara repeatedly slapped Graciela, called her a "bitch," and pulled her hair. As a result of this incident, Graciela's arm was put in a sling, and she spent one week in the hospital.

g. In 1985, Defendant Guevara attempted to coerce a false statement from Reynaldo Munoz. Guevara handcuffed Munoz and put him in the back of a squad car. When Munoz denied any knowledge of the incident Guevara was asking about, Guevara repeatedly punched Munoz in the mouth. Guevara then took Munoz to rival gang territory where he allowed rival gang members to spit on and beat Munoz.

h. In 1986, Defendant Guevara threw Rafael Garcia against a car, struck him in the face several times, kicked him, and hit him in the head. Garcia filed a complaint with OPS. Guevara denied the charges, but OPS found Guevara had lied about the incident and recommended Guevara be suspended for two days.

i. In 1986, Defendant Guevara and two other officers coerced a confession from Daniel Pena by beating him with their hands and flashlights.

j. In 1986, Defendant Guevara pulled over Melvin Warren because Warren cut him off while driving. Guevara called Warren a “nigger dog” and “threatened to tear [Warren’s] head off.” Guevara hit Warren in the face with a closed fist and then forced him down into the front seat of his car and began to choke him. OPS sustained Warren’s allegations that Guevara had physically and verbally assaulted him and recommended that Guevara be reprimanded.

k. In 1988, Defendant Guevara, in concert with his partner Steve Gawrys, and under the supervision of Ed Mingey, caused 12-year-old Orlando Lopez to falsely identify Jacques Rivera as the person who shot Felix Valentin. As a result, Rivera was wrongfully convicted of the Valentin murder.

l. Also, during the Felix Valentin shooting investigation, Defendant Guevara falsely claimed the victim, Valentin, identified Jacques Rivera as his shooter before he died. Guevara reported to have obtained this identification at a time when the victim was in a medically induced coma, unresponsive to any stimuli, and laying in a bed that was in constant motion to prevent his lungs from filling with fluid and killing him. Valentin could not possibly have provided the information that Defendant Guevara attributed to him.

m. After Jacques Rivera's exoneration, he brought suit against Defendant Guevara. A federal jury found that Guevara had violated Rivera's civil rights and awarded Rivera $17 million in damages, as well as $175,000 in punitive damages against Defendant Guevara, his partner Defendant Gawrys, and his supervisor Ed Mingey.

a. In 1989, Defendant Guevara coerced Samuel Perez into falsely identifying Juan Johnson as the person who killed Ricardo Fernandez. Guevara made Perez get inside his car, showed Perez a photo of Johnson, and told Perez he wanted Johnson to take the blame for the murder.

b. In 1989, Defendant Guevara also coerced Salvador Ortiz into making a false identification of Juan Johnson, which Ortiz later recanted.

c. Juan Johnson was exonerated and brought suit against Defendant Guevara. A federal jury found that Guevara framed Johnson for murder and awarded Johnson $21 million in damages.

d. In 1989, Defendant Guevara coerced Virgilio Muniz into making a false identification by repeatedly threatening Muniz, saying that if Muniz did not identify Manuel Rivera as the murderer, Muniz would "go down for the murder."

e. In 1989, Defendant Guevara coerced Virgilio Calderon Muniz (unrelated to Virgilio Muniz, described in the above paragraph) into making a false identification by telling him who to identify and making a veiled threat as to what would happen if he did not comply.

f. In 1989, Defendant Guevara coerced a false confession from Victor Vera by transporting him to rival gang territory and threatening to release him unless he confessed to the murder of Edwin Castaneda. Fearing for his life, Vera agreed to falsely confess to a crime that he had nothing to do with.

g. In 1990, Defendant Guevara paid two juvenile witnesses to falsely identify a suspect from a photo array in a shooting investigation, leading to the suspect's wrongful conviction.

h. In 1991, Defendant Guevara coerced Wilfredo Rosario into making a false identification and giving false testimony before the grand jury. Guevara threatened that if Rosario did not identify Xavier Arcos as the murderer, Rosario would be "pinned" for the murder. Guevara fed Rosario details of the crime, such as the number of shots fired, the type of vehicle used in the crime, and the participants in the crime. Rosario recanted his identification of Arcos at trial, but Arcos was still wrongfully convicted.

i. In 1991, Defendant Guevara told Efrain and Julio Sanchez to pick David Colon out of a lineup. As a result, these men falsely accused Colon of committing a murder, though they later recanted citing Guevara's misconduct.

j. In 1991, Defendant Guevara coerced David Rivera into signing a confession for murder by intimidation, threats, and inducements. Guevara told Rivera that if he confessed, he would serve seven years in prison; if he did not confess, he would be sent away for 50 years. Guevara then promised Rivera that if he signed a statement, he could go home.

k. In 1991, Defendant Guevara framed Demetrius Johnson for killing Edwin Fred. Guevara suppressed a lineup report documenting that a key eyewitness had identified a different person as the perpetrator in a lineup, and he fabricated a false police report to make it appear as if that identification had never occurred. Guevara also manipulated and fabricated three other eyewitness identifications of Johnson as the shooter. l. In 1992, Defendant Guevara illegally prevented any adult or youth officer from being present while he interrogated juvenile Jacqueline Montanez. As a result, Montanez was wrongfully convicted of murder.

m. In 1993, Defendant Guevara coerced Carl Richmond into falsely identifying Robert Bouto as the murderer of one of Richmond's friends.

n. In 1993, Defendant Guevara arrested 15-year-old Eliezar Cruzado and threatened him with life imprisonment if Cruzado did not make a statement implicating himself in a murder. Guevara also told Cruzado that he could go home and see his family again, but only if he agreed to make a statement. At the time, Cruzado had a limited ability to read and write.

o. In 1993, Defendant Guevara used physical force and threats to coerce a false confession from Adolfo Frias-Munoz. During the two-day interrogation, Frias-Munoz was handcuffed to a ring on the wall of the interrogation room, hit in the face by Guevara, and beaten by two other officers. Frias-Munoz could hear his wife screaming and his son crying in another room. Guevara threatened Frias-Munoz that if he did not confess, his wife would go to

prison, and his children would be taken away. Frias-Munoz, who did not speak English, agreed to falsely confess.

p. In 1993, Defendant Guevara physically abused and threatened Francisco Vicente to coerce him into falsely implicating Geraldo Iglesias in a murder. Vicente later testified Guevara and other officers beat him, threatened him, and fed him facts to facilitate the false story.

q. In 1994, Defendant Guevara, after 14 hours of interrogation, coerced a confession from Adrian Duta by beating him and telling him he could go home if he signed a statement.

r. In 1995, Defendant Guevara arrested Edwin Davila and, in an attempt to coercea confession, chained Davila to the wall of an interrogation room and told him that he was going to frame him for murder. After Davila maintained that he was uninvolved, Guevara forced Davila to participate in a lineup in which two witnesses falsely identified Davila as the perpetrator.

s. In 1995, Defendant Guevara coerced Evelyn Diaz into making a false identification and providing false testimony to the Grand Jury by threatening Diaz that, if she did not falsely identify Luis Serrano as the shooter, the Department of Children and Family Services would take away her children.

t. In 1995, Defendant Guevara told Luis Figueroa to falsely identify Angel Diaz as the perpetrator knowing Figueroa did not see anything, causing Figueroa to be wrongfully convicted.

u. In 1995, Defendant Guevara coerced Gloria Ortiz Bordoy into making a false statement and testifying falsely against Santos Flores. During Ortiz Bordoy's

hours long interrogation, Guevara yelled in her face, swore at her, threatened that DCFS would take her children, and threatened to hit her.

v. In 1995, Defendant Guevara coerced Rodolfo Zaragoza into falsely identifying Ricardo Rodriguez as the perpetrator of a shooting.

w. In 1995, Defendant Guevara told Jose Melendez to falsely identify Thomas Sierra as the shooter of Noel Andujar, even though Melendez had not seen the shooter and told Guevara as much. In addition, Guevara wrote false reports saying Melendez and another man identified a car as the one used in the shooting.

x. In 1995, Defendant Guevara coerced a confession from 17-year-old Santos Flores after handcuffing him to the wall of an interview room and refusing his requests for an attorney. During the 11-hour interrogation, Guevara yelled at him, slapped him, and told him if he did not confess, he would never see the light of day.

y. In 1996, Defendant Guevara coerced Maria Rivera into making a false identification by unzipping his pants and propositioning her. Rivera later told the prosecutor she had falsely identified an individual in a lineup at Guevara's direction. The prosecution abandoned murder charges against that individual.

z. In 1996, Defendant Guevara framed Louis Robinson for murder after Robinson refused to pay Guevara protection money or falsely identify Guevara's chosen suspect in a different crime. Guevara coerced an eyewitness into identifying Robinson from a photo array and a lineup and fabricated evidence that Robinson lied about his alibi.

aa. In 1997, Defendant Guevara coerced Robert Ruiz into falsely implicating Freddy and Concepcion Santiago for the murder of Guevarra's nephew. Guevara detained Ruiz repeatedly over a 10-day period, locking him in an interrogation room without food, water, or access to the bathroom. Guevara told Ruiz who to identify and what to say in his statement.

bb. In 1997, Defendant Guevara coerced a false confession from Voytek Dembski by beating him while he was chained to a wall in a locked interrogation room. Guevara interrogated Dembski, a Polish national who did not speak English, without Miranda warnings, without notification to the Polish consulate, and without a Polish language interpreter. Dembski could not read the statement he eventually signed as it was written in English.

cc. In 1997, Defendant Guevara used threats and physical force against Ariel Gomez, Paul Yalda, and several of their co-defendants to try to get them to sign false statements incriminating Gomez in the shooting of Concepcion Diaz. Guevara also used pressure and threats to try to force three eyewitnesses, Ruth Antonetty, Debbie Daniels and Maria Castro, to falsely identify Ariel Gomez as the shooter even after they informed Guevara that they could not.

dd. In 1997, Defendant Guevara coerced witnesses into identifying Oscar Soto from lineups in two separate murder investigations, even though witnesses had identified the true perpetrator of one of the crimes ten days earlier, before Guevara was ever involved in the investigation.

ee. In 1998, Defendant Guevara tried to extract a false confession from Rosauro Mejia by beating Mejia. Mejia never confessed and was finally released after being held in custody for three days.

ff. In 1998, Defendant Guevara repeatedly pulled Adriana Mejia's hair and struck her on the back of her neck while interrogating her. She asserts that Guevara never took an accurate statement from her, despite that she did have real knowledge of the crime he was questioning her about.

gg. In 1998, Defendant Guevara repeatedly threatened and beat Arturo DeLeon-Reyes to coerce DeLeon-Reyes into giving an incriminating statement. After two days of isolation and interrogation, DeLeon-Reyes provided a false statement implicating himself in a murder in which he was not involved.

hh. In 1998, Defendant Guevara beat Gabriel Solache while Solache was chained to the wall of a locked interrogation room. After 40 hours of interrogation, Solache gave a false statement so the beating would stop. Solache sought medical treatment and sustained permanent hearing loss to his left ear.

ii. In 1999, Defendant Guevara and his colleagues used physical violence to coerce David Gecht into adopting a fabricated statement, fed to him by Guevara, confessing to a shooting of which he had no knowledge.

jj. In addition, Guevara coerced Gecht's pregnant girlfriend, Colleen Miller, into falsely implicating Gecht in a shooting, telling her she would be arrested, and her baby would be born in prison and taken from her if she did not cooperate.

kk. In November 2001, Defendant Guevara's girlfriend, Judith Martinez, attended a trial where Guevara was testifying and watched other witnesses' testimony. She told Guevara about the other witnesses' testimony before he took the stand, in violation of a court order sequestering witnesses.

ll. In 2001, the FBI authored a special report detailing the criminal activity of Chicago police officer Joseph Miedzianowski and his associates, including Defendant Guevara. The FBI reported that Guevara, while acting as a police officer, solicited bribes from drug and gun dealers in exchange for the promise not to arrest them; took bribes to alter lineups of murder suspects; and took cash in exchange for dismissing murder cases he investigated.

mm. In 2011, the First District Appellate Court granted Tony Gonzalez a postconviction hearing based on evidence that Defendant Guevara conducted an unduly suggestive lineup.

**ANSWER:** Answering Defendants object to the allegations in this paragraph, which spans 13 pages and, therefore, cannot be answered concisely. To the extent an answer is required, Answering Defendants deny the allegations to the extent they are directed against them. Answering Defendants lack knowledge or information sufficient to admit or deny the remaining allegations contained in paragraph 145 and subparagraphs (a) through (mm), inclusive.

146. Neither the City of Chicago nor the Chicago Police Department ever disciplined Defendant Guevara for any of the above misconduct.

**ANSWER:** Answering Defendants deny the allegations of misconduct in this paragraph to the extent they are directed against them. Answering Defendants lack knowledge or information sufficient to admit or deny the allegations in paragraph 146.

147. In fact, the City of Chicago failed to supervise or discipline its police officers, including Defendants Guevara and the other Defendants. Defendants engaged in the misconduct set forth in this complaint because they knew the City of Chicago and its police department

tolerated and condoned such conduct.

**ANSWER:** Answering Defendants deny the allegations of misconduct in this paragraph to the extent they are directed against them. Answering Defendants lack knowledge or information sufficient to admit or deny the allegations in paragraph 147.

**COUNT I**
**42 U.S.C. § 1983 – Due Process**
**(Fourteenth Amendment)**

148. Plaintiff incorporates each paragraph of this complaint as if fully restated here.

**ANSWER:** Answering Defendants adopt and incorporate their responses to each paragraph of this complaint, above, as and for their response to this paragraph, as if fully restated here.

149. As described above, Defendants, while acting individually, jointly, and in conspiracy with each other, and under color of law and within the scope of their employment, deprived Plaintiff of his constitutional right to a fair trial and his right not to be wrongfully convicted and imprisoned.

**ANSWER:** Answering Defendants deny the allegations in this paragraph to the extent they are directed against them. Answering Defendants lack knowledge or information sufficient to admit or deny the remaining allegations in paragraph 149.

150. In the manner described above, Defendants fabricated witness statements falsely implicating Plaintiff in the crime.

**ANSWER:** Answering Defendants deny the allegations in this paragraph to the extent they are directed against them. Answering Defendants lack knowledge or information sufficient to admit or deny the remaining allegations in paragraph 150.

151. Defendants knew this evidence was false.

**ANSWER:** Answering Defendants deny the allegations in this paragraph to the extent they are directed against them. Answering Defendants lack knowledge or information sufficient to admit or deny the remaining allegations in paragraph 151.

152. Defendants obtained Plaintiff's conviction using this false evidence, and they failed to correct fabricated evidence they knew was false when it was used against Plaintiff during his criminal case.

**ANSWER:** Answering Defendants deny the allegations in this paragraph to the extent they are directed against them. Answering Defendants lack knowledge or information sufficient to admit or deny the remaining allegations in paragraph 152.

153. Defendants also fabricated supposed eyewitness identifications of Plaintiff, which they knew were false and unreliable, using threats to force witnesses to falsely identify Plaintiff. Defendants caused the State to use those false identifications against Plaintiff at his criminal trial.

**ANSWER:** Answering Defendants deny the allegations in this paragraph to the extent they are directed against them. Answering Defendants lack knowledge or information sufficient to admit or deny the remaining allegations in paragraph 153.

154. In addition, Defendants deliberately withheld exculpatory evidence from state prosecutors, Plaintiff, and Plaintiff's criminal defense attorneys, including evidence that Defendants had manufactured false identifications of Plaintiff, thereby misleading and misdirecting the criminal prosecution of Plaintiff.

**ANSWER:** Answering Defendants deny the allegations in this paragraph to the extent they are directed against them. Answering Defendants lack knowledge or information sufficient to admit or deny the remaining allegations in paragraph 154.

155. In addition, Defendants concealed, fabricated, and destroyed other evidence not yet known to Plaintiff.

**ANSWER:** Answering Defendants deny the allegations in this paragraph to the extent they are directed against them. Answering Defendants lack knowledge or information sufficient to admit or deny the remaining allegations in paragraph 155.

156. The Defendants' misconduct caused Plaintiff's unjust and wrongful criminal prosecution and deprivation of liberty, violating his right under the Fourteenth Amendment to a fair trial. Absent Defendants' misconduct, Plaintiff's prosecution could not and would not have been pursued.

**ANSWER:** Answering Defendants deny the allegations in this paragraph to the extent they are directed against them. Answering Defendants lack knowledge or information sufficient to admit or deny the remaining allegations in paragraph 156.

157. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally and in total disregard of the truth and Plaintiff's clear innocence.

**ANSWER:** Answering Defendants deny the allegations in this paragraph to the extent they are directed against them. Answering Defendants lack knowledge or information sufficient to admit or deny the remaining allegations in paragraph 157.

158. As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, forced and involuntary prison labor, and other grievous and continuing injuries and damages as set forth above.

**ANSWER:** Answering Defendants deny the allegations in this paragraph to the extent they are directed against them. Answering Defendants lack knowledge or information sufficient to admit or deny the remaining allegations in paragraph 158.

159. Defendants undertook the misconduct described in this Count pursuant to the policies and practices of the City of Chicago and the Chicago Police Department, in the manner more fully described below.

**ANSWER:** Answering Defendants deny the allegations in this paragraph to the extent they are directed against them. Answering Defendants lack knowledge or information sufficient to admit or deny the remaining allegations in paragraph 159.

## COUNT II
## 42 U.S.C. § 1983 – Malicious Prosecution and Unlawful Detention
## (Fourth and Fourteenth Amendments)

160. Plaintiff incorporates each paragraph of this complaint as if fully restated here.

**ANSWER:** Answering Defendants adopt and incorporate their responses to each paragraph of this complaint, above, as and for their response to this paragraph, as if fully restated here.

161. As described above, Defendants, individually, jointly, and in conspiracy with each other, and under color of law and within the scope of their employment, accused Plaintiff of criminal activity and exerted influence to initiate, continue, and perpetuate judicial proceedings against Plaintiff. They did so without any probable cause and despite knowing Plaintiff was

innocent, in violation of his rights secured by the Fourth and Fourteenth Amendments.

**ANSWER:** Answering Defendants deny the allegations in this paragraph to the extent they are directed against them. Answering Defendants lack knowledge or information sufficient to admit or deny the remaining allegations in paragraph 161.

162. In so doing, Defendants maliciously prosecuted Plaintiff, caused Plaintiff to be deprived of his liberty without probable cause, and caused Plaintiff to be improperly subjected to judicial proceedings for which there was no probable cause. These judicial proceedings were instituted and continued maliciously, resulting in injury.

**ANSWER:** Answering Defendants deny the allegations in this paragraph to the extent they are directed against them. Answering Defendants lack knowledge or information sufficient to admit or deny the remaining allegations in paragraph 162.

163. The misconduct described in this Count was objectively unreasonable, and Defendants undertook the misconduct intentionally and in total disregard of the truth and Plaintiff's clear innocence.

**ANSWER:** Answering Defendants deny the allegations in this paragraph to the extent they are directed against them. Answering Defendants lack knowledge or information sufficient to admit or deny the remaining allegations in paragraph 163.

164. As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

**ANSWER:** Answering Defendants deny the allegations in this paragraph to the extent they are directed against them. Answering Defendants lack knowledge or information sufficient to admit or deny the remaining allegations in paragraph 164.

165. Defendants undertook the misconduct described in this Count pursuant to the policies and practices of the City of Chicago and the Chicago Police Department, in the manner more fully described below.

**ANSWER:** Answering Defendants deny the allegations in this paragraph to the extent they are directed against them. Answering Defendants lack knowledge or information sufficient to admit or deny the remaining allegations in paragraph 165.

**COUNT III**
**42 U.S.C. § 1983 – Failure to Intervene**

166. Plaintiff incorporates each paragraph of this complaint as if fully restated here.

**ANSWER:** Answering Defendants adopt and incorporate their responses to each paragraph of this complaint, above, as and for their response to this paragraph, as if fully restated here.

167. As described above, during the constitutional violations described in this complaint, one or more of the Defendants stood by without intervening to prevent the violation of Plaintiff's constitutional rights.

**ANSWER:** Answering Defendants deny the allegations in this paragraph to the extent they are directed against them. Answering Defendants lack knowledge or information sufficient to admit or deny the remaining allegations in paragraph 167.

168. Defendants had ample, reasonable opportunities and the duty to prevent this harm but failed to do so.

**ANSWER:** Answering Defendants deny the allegations in this paragraph to the extent they are directed against them. Answering Defendants lack knowledge or information sufficient to admit or deny the remaining allegations in paragraph 168.

169. The misconduct described in this Count was objectively unreasonable, and Defendants undertook the misconduct intentionally and in total disregard of the truth and Plaintiff's clear innocence.

**ANSWER:** Answering Defendants deny the allegations in this paragraph to the extent they are directed against them. Answering Defendants lack knowledge or information sufficient to admit or deny the remaining allegations in paragraph 169.

170. As a result of these Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

**ANSWER:** Answering Defendants deny the allegations in this paragraph to the extent they are directed against them. Answering Defendants lack knowledge or information sufficient to admit or deny the remaining allegations in paragraph 170.

171. The misconduct described in this Count by the Defendants was undertaken pursuant to the policies and practices of the City of Chicago and the Chicago Police Department, in the manner more fully described below in Count V.

**ANSWER:** Answering Defendants deny the allegations in this paragraph to the extent they are directed against them. Answering Defendants lack knowledge or information sufficient to admit or deny the remaining allegations in paragraph 171.

**COUNT IV**
**42 U.S.C. § 1983 – Conspiracy to Violate Constitutional Rights**

172. Plaintiff incorporates each paragraph of this complaint as if fully restated here.

**ANSWER:** Answering Defendants adopt and incorporate their responses to each paragraph of this complaint, above, as and for their response to this paragraph, as if fully restated here.

173. As described more fully above, Defendants, acting in concert with other coconspirators, known and unknown, reached an agreement among themselves to fabricate and suppress evidence to detain, prosecute, and convict Plaintiff, without regard for Plaintiff's guilt or innocence, and thereby to deprive him of his constitutional rights.

**ANSWER:** Answering Defendants deny the allegations in paragraph 173.

174. In so doing, these co-conspirators agreed to accomplish an unlawful purpose by an unlawful means. In addition, these co-conspirators agreed among themselves to protect each other from liability for depriving Plaintiff of those rights.

**ANSWER:** Answering Defendants deny the allegations in paragraph 174.

175. In furtherance of their conspiracy, each co-conspirator committed overt acts and was otherwise a willful participant in joint activity.

**ANSWER:** Answering Defendants deny the allegations in paragraph 175.

176. The misconduct described in this Count was objectively unreasonable, and Defendants undertook the misconduct intentionally and in total disregard of the truth and

Plaintiff's clear innocence.

**ANSWER:** Answering Defendants deny the allegations in paragraph 176.

177. As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

**ANSWER:** Answering Defendants deny the allegations in paragraph 177.

178. Defendants undertook the misconduct described in this Count pursuant to the policies and practices of the City of Chicago and the Chicago Police Department, in the manner more fully described below.

**ANSWER:** Answering Defendants deny the allegations in paragraph 178.

**COUNT V**
**42 U.S.C. § 1983 – Policy and Practice Claim against the City of Chicago**

179. Plaintiff incorporates each paragraph of this complaint as if fully restated here.

**ANSWER:** Answering Defendants adopt and incorporate their responses to each paragraph of this complaint, above, as and for their response to this paragraph, as if fully restated here.

180. As described in detail above, the City of Chicago is liable for the violation of Plaintiff's constitutional rights because Plaintiff's injuries were caused by the City's policies, practices, and customs, as well as by the actions of policy-making officials for the City of Chicago.

**ANSWER:** Answering Defendants deny the allegations in this paragraph to the extent they are directed against them. Answering Defendants lack knowledge or information sufficient to admit or deny the remaining allegations in paragraph 180.

181. At all relevant times, and for a period of time before and after Plaintiff's wrongful conviction, the City of Chicago failed to promulgate proper or adequate rules, regulations, policies, and procedures for: conducting photographic and live lineup procedures by officers and

agents of the Chicago Police Department and City of Chicago; conducting interrogations and questioning criminal suspects; collecting, documenting, preserving, testing, and disclosing evidence; writing police reports and taking investigative notes; obtaining statements and testimony from witnesses; and maintaining investigative files and disclosing those files in criminal proceedings. In addition, or alternatively, the City of Chicago failed to promulgate proper and adequate rules, regulations, policies, and procedures for training and supervising officers and agents of the Chicago Police Department and the City of Chicago, with respect to these subjects.

**ANSWER:** Answering Defendants deny the allegations in this paragraph to the extent they are directed against them. Answering Defendants lack knowledge or information sufficient to admit or deny the remaining allegations in paragraph 181.

182. At all relevant times, and for a period of time before Plaintiff's wrongful conviction, the City of Chicago had notice of a widespread practice and custom by officers and agents of the Chicago Police Department and the City of Chicago under which individuals suspected of criminal activity, like Plaintiff, were routinely deprived of their right to due process. For instance, it was common that suspects were prosecuted based on fabricated evidence, including fabricated eyewitness identifications and eyewitness identifications obtained using manipulated photographic or live lineup procedures.

**ANSWER:** Answering Defendants deny the allegations in this paragraph to the extent they are directed against them. Answering Defendants lack knowledge or information sufficient to admit or deny the remaining allegations in paragraph 182.

183. Specifically, at all relevant times and for a period of time prior thereto, there existed a widespread practice and custom among officers, employees, and agents of the City of Chicago, under which criminal suspects were coerced to involuntarily implicate themselves by various means, including the following: (1) individuals were subjected to unreasonably long and uninterrupted interrogations, often lasting for many hours and even days; (2) individuals were

subjected to actual and threatened physical or psychological violence; (3) individuals were interrogated at length without proper protection of their constitutional right to remain silent; (4) individuals were forced to sign or assent to oral and written statements fabricated by the police; (5) officers and employees were permitted to lead or participate in interrogations without proper training or knowledge of necessary safeguards against abusive conditions and involuntarily and/or false confessions; and (6) supervisors with knowledge of permissible interrogation techniques did not properly supervise or discipline officers and employees, causing coercive interrogations to continue unchecked.

**ANSWER:** Answering Defendants deny the allegations in this paragraph to the extent they are directed against them. Answering Defendants lack knowledge or information sufficient to admit or deny the remaining allegations in paragraph 183.

184. In addition, at all relevant times and for a period of time before and after Plaintiff's wrongful conviction, the City of Chicago had notice of widespread practices by officers and agents of the Chicago Police Department and the City of Chicago, including that officers: (1) did not record investigative information in police reports, maintain proper investigative files, or disclose investigative materials to prosecutors and criminal defendants; (2) falsified witnesses' statements and testimony; (3) fabricated false evidence implicating criminal defendants in criminal conduct; (4) failed to maintain or preserve evidence or destroyed evidence; and (5) pursued wrongful convictions through profoundly flawed investigations.

**ANSWER:** Answering Defendants deny the allegations in this paragraph to the extent they are directed against them. Answering Defendants lack knowledge or information sufficient to admit or deny the remaining allegations in paragraph 184.

185. These widespread practices, individually and together, were allowed to flourish because the City of Chicago's leaders, supervisors, and policymakers directly encouraged and were thereby the moving force behind the very type of misconduct that occurred in Plaintiff's case. They did this by failing to adequately train and supervise their officers, agents, and

employees on proper interrogation techniques and by failing to adequately punish and discipline past instances of similar misconduct, which directly encouraged future abuses like those affecting Plaintiff.

**ANSWER:** Answering Defendants deny the allegations in this paragraph to the extent they are directed against them. Answering Defendants lack knowledge or information sufficient to admit or deny the remaining allegations in paragraph 185.

186. The above widespread practices and customs, so well settled as to constitute de facto policies of the City of Chicago, were able to exist and thrive, individually and together, because policymakers with authority exhibited deliberate indifference to the problem, thereby effectively ratifying it.

**ANSWER:** Answering Defendants deny the allegations in this paragraph to the extent they are directed against them. Answering Defendants lack knowledge or information sufficient to admit or deny the remaining allegations in paragraph 186.

187. As a result of the City of Chicago's policies and practices, numerous individuals have been wrongly convicted of crimes they did not commit.

**ANSWER:** Answering Defendants deny the allegations in this paragraph to the extent they are directed against them. Answering Defendants lack knowledge or information sufficient to admit or deny the remaining allegations in paragraph 187.

188. Defendants undertook the misconduct described in this Count pursuant to the City of Chicago's policies and practices in that the constitutional violations committed against Plaintiff were committed with the knowledge or approval of persons with final policymaking authority for the City of Chicago or were actually committed by persons with such final policymaking authority.

**ANSWER:** Answering Defendants deny the allegations in this paragraph to the extent they are directed against them. Answering Defendants lack knowledge or information sufficient to admit or deny the remaining allegations in paragraph 188.

189. Plaintiff's injuries were directly and proximately caused by officers, agents, and employees of the City of Chicago, including the individually named defendants, who acted

pursuant to one or more of the policies, practices, and customs set forth above in engaging in the misconduct described in this Count.

**ANSWER:** Answering Defendants deny the allegations in this paragraph to the extent they are directed against them. Answering Defendants lack knowledge or information sufficient to admit or deny the remaining allegations in paragraph 189.

## COUNT VI
## State Law Claim – Malicious Prosecution

190. Plaintiff incorporates each paragraph of this complaint as if fully restated here.

**ANSWER:** Answering Defendants adopt and incorporate their responses to each paragraph of this complaint, above, as and for their response to this paragraph, as if fully restated here.

191. As described above, Defendants, individually, jointly, and in conspiracy with each other, and within the scope of their employment, accused Plaintiff of criminal activity and exerted influence to initiate, continue, and perpetuate judicial proceedings against Plaintiff without any probable cause for doing so.

**ANSWER:** Answering Defendants deny the allegations in this paragraph to the extent they are directed against them. Answering Defendants lack knowledge or information sufficient to admit or deny the remaining allegations in paragraph 191.

192. In so doing, Defendants caused Plaintiff to be subjected improperly to judicial proceedings for which there was no probable cause. Those judicial proceedings were instituted and continued maliciously, resulting in injury.

**ANSWER:** Answering Defendants deny the allegations in this paragraph to the extent they are directed against them. Answering Defendants lack knowledge or information sufficient to admit or deny the remaining allegations in paragraph 192.

193. The judicial proceedings were terminated in Plaintiff's favor and in a manner indicative of his innocence when his conviction was vacated and charges against him were dropped in July 2024.

**ANSWER:** Answering Defendants deny the allegations in paragraph 193.

194. The misconduct described in this Count was objectively unreasonable and Defendants undertook the misconduct intentionally, with malice, and in total disregard of the truth and Plaintiff's clear innocence.

**ANSWER:** Answering Defendants deny the allegations in this paragraph to the extent they are directed against them. Answering Defendants lack knowledge or information sufficient to admit or deny the remaining allegations in paragraph 194.

195. As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

**ANSWER:** Answering Defendants deny the allegations in this paragraph to the extent they are directed against them. Answering Defendants lack knowledge or information sufficient to admit or deny the remaining allegations in paragraph 195.

**COUNT VII**
**State Law Claim – Intentional Infliction of Emotional Distress**

196. Plaintiff incorporates each paragraph of this complaint as if fully restated here.

**ANSWER:** Answering Defendants adopt and incorporate their responses to each paragraph of this complaint, above, as and for their response to this paragraph, as if fully restated here.

197. Defendants' actions, omissions, and conduct described above were extreme and outrageous. Their actions were rooted in an abuse of power and authority. And Defendants undertook their actions intending to cause, or recklessly disregarding the probability their conduct would cause, severe emotional distress to Plaintiff, as is more fully alleged above.

**ANSWER:** Answering Defendants deny the allegations in this paragraph to the extent they are directed against them. Answering Defendants lack knowledge or information sufficient to admit or deny the remaining allegations in paragraph 197.

198. As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

**ANSWER:** Answering Defendants deny the allegations in this paragraph to the extent they are directed against them. Answering Defendants lack knowledge or information sufficient to admit or deny the remaining allegations in paragraph 198.

**COUNT VIII**
**State Law Claim – Willful and Wanton Conduct**

199. Plaintiff incorporates each paragraph of this complaint as if fully restated here.

**ANSWER:** Answering Defendants adopt and incorporate their responses to each paragraph of this complaint, above, as and for their response to this paragraph, as if fully restated here.

200. At all times relevant to this complaint Defendants had a duty to refrain from willful and wanton conduct.

**ANSWER:** Answering Defendants deny the allegations in this paragraph to the extent they are directed against them. Answering Defendants lack knowledge or information sufficient to admit or deny the remaining allegations in paragraph 200.

201. Notwithstanding that duty, Defendants acted willfully and wantonly through a course of conduct that showed an utter indifference to, or conscious disregard of, Plaintiff's rights.

**ANSWER:** Answering Defendants deny the allegations in in paragraph 201.

202. As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

**ANSWER:** Answering Defendants deny the allegations in this paragraph to the extent they are directed against them. Answering Defendants lack knowledge or information sufficient to admit or deny the remaining allegations in paragraph 202.

**COUNT IX**
**State Law Claim – Civil Conspiracy**

203. Plaintiff incorporates each paragraph of this complaint as if fully restated here.

**ANSWER:** Answering Defendants adopt and incorporate their responses to each paragraph of this complaint, above, as and for their response to this paragraph, as if fully restated here.

204. As described more fully in the preceding paragraphs, Defendants, acting in concert with other co-conspirators, known and unknown, reached an agreement among themselves to frame Plaintiff for a crime he did not commit and conspired by concerted action to accomplish an unlawful purpose and/or to achieve a lawful purpose by unlawful means. In addition, these coconspirators agreed among themselves to protect each other from liability for depriving Plaintiff of his rights.

**ANSWER:** Answering Defendants deny the allegations in in paragraph 204.

205. In furtherance of their conspiracy, each co-conspirator committed overt acts and was otherwise a willful participant in joint activity.

**ANSWER:** Answering Defendants deny the allegations in in paragraph 205.

206. The violations of Illinois law described in this complaint, including Defendants' malicious prosecution of Plaintiff and their intentional infliction of emotional distress, were accomplished by Defendants' conspiracy.

**ANSWER:** Answering Defendants deny the allegations in in paragraph 206.

207. The misconduct described in this Count was objectively unreasonable, and Defendants undertook the misconduct intentionally and in total disregard of the truth and Plaintiff's clear innocence.

**ANSWER:** Answering Defendants deny the allegations in in paragraph 207.

208. As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

**ANSWER:** Answering Defendants deny the allegations in in paragraph 208.

## COUNT X
## State Law Claim – *Respondeat Superior*

209. Plaintiff incorporates each paragraph of this complaint as if fully restated here.

**ANSWER:** Answering Defendants adopt and incorporate their responses to each paragraph of this complaint, above, as and for their response to this paragraph, as if fully restated here.

210. While committing the misconduct alleged in the preceding paragraphs, the individual defendants were employees, members, and agents of the City of Chicago, acting at all relevant times within the scope of their employment.

**ANSWER:** Answering Defendants admit they were employees of the City of Chicago acting at all relevant times within the scope of their employment. Answering Defendants deny they committed any misconduct and deny the remaining allegations of paragraph 210.

211. Defendant City of Chicago is liable as principal for all torts committed by its agents.

**ANSWER:** Answering Defendants deny the allegations in paragraph 211.

## COUNT XI
## State Law Claim – Indemnification

212. Plaintiff incorporates each paragraph of this complaint as if fully restated here.

**ANSWER:** Answering Defendants adopt and incorporate their responses to each paragraph of this complaint, above, as and for their response to this paragraph, as if fully restated here.

213. Illinois law provides that public entities are directed to pay any tort judgment for compensatory damages for which employees are liable within the scope of their employment activities.

**ANSWER:** This paragraph states a legal conclusion. To the extent this paragraph alleges the Answering Defendants committed misconduct or are otherwise liable, Answering Defendants deny the allegations in paragraph 213.

214. The individual defendants were employees, members, and agents of Defendant City of Chicago, acting at all relevant times within the scope of their employment in committing the misconduct described herein.

**ANSWER:** Answering Defendants admit they were employees of the City of Chicago acting at all relevant times within the scope of their employment. Answering Defendants deny they committed any misconduct and deny the remaining allegations of paragraph 214.

215. Defendant City of Chicago is responsible to pay any judgment entered against the individual defendants.

**ANSWER:** Answering Defendants admit they were employees of the City of Chicago acting at all relevant times within the scope of their employment. Answering Defendants deny they committed any misconduct and deny the remaining allegations of paragraph 215.

WHEREFORE, Answering Defendants request judgment in their favor and against Plaintiff, costs of suit and attorneys' fees, and such other relief as the court deems appropriate.

## AFFIRMATIVE DEFENSES

### First Affirmative Defense

Answering Defendants were government officials, namely police officers, who perform discretionary functions. At all times material to the events alleged in Plaintiff's complaint, a reasonable police officer, objectively viewing the facts and circumstances that confronted Answering Defendants, could have believed their actions to be lawful, in light of clearly established law and the information that Answering Defendants possessed. Answering Defendants are therefore entitled to qualified immunity as to Plaintiff's federal claims.

### Second Affirmative Defense

Defendants are absolutely immune from civil liability for their testimony given in judicial proceedings in plaintiff's underlying criminal case. *Briscoe v. LaHue*, 460 U.S. 325, 330–31, 103

S.Ct. 1108, 1113 (1983); *Jurgensen v. Haslinger*, 295 Ill.App.3d 139, 141–42; 692 N.E.2d 347, 349-50 (3rd Dist. 1998).

**Third Affirmative Defense**

Plaintiff's claims are barred by the doctrines of res judicata, collateral estoppel, judicial estoppel, and waiver.

**Fourth Affirmative Defense**

Plaintiff's failure to intervene claim has no basis in the Constitution as "[f]ailure to intervene' sounds like vicarious liability," which would of course be untenable, as "[t]he Supreme Court has held many times that § 1983 supports only direct, and not vicarious, liability." *Mwangangi v. Nielsen*, 48 F.4th 816, 834 (7th Cir. 2022) (Easterbrook, J., concurring).

**Fifth Affirmative Defense**

Plaintiff's claim under Illinois Law for intentional infliction of emotional distress (Count VII) is barred by the one-year statute of limitations under the Illinois Governmental and Governmental Employees Tort Immunity Act, 745 ILCS 10/8-101 because it was not filed within one year after it accrued.

**Sixth Affirmative Defense**

Plaintiff's claims as alleged in his Complaint are barred in whole or in part by the applicable statute of limitations.

**Seventh Affirmative Defense**

As to Plaintiff's state law claims, Answering Defendants are not liable for any of the claims alleged because a public employee is not liable for his or her acts or omissions in the execution or enforcement of any law, unless such acts or omissions constitute willful and wanton conduct, and none of their acts or omissions in the execution or enforcement of any law

constituted willful and wanton conduct. 745 ILCS 10/2-202.

**Eighth Affirmative Defense**

As to Plaintiff's state law claims, Answering Defendants are not liable for any claims alleged because their decisions regarding the investigation and/or the arrest of Plaintiff were decisions that involved the determination of policy and the exercise of discretion for which they are immune from liability. 745 ILCS 10/2-201.

**Ninth Affirmative Defense**

As to Plaintiff's state law claims, Answering Defendants are not liable for any claims alleged because a public employee is not liable for injury caused by his instituting or prosecuting any judicial or administrative proceeding within the scope of his employment, unless he acts maliciously and without probable cause. 745 ILCS 10/2-208.

**Tenth Affirmative Defense**

As to Plaintiff's state law claims, Answering Defendants not liable for any claims alleged claims because a public employee, as such and acting within the scope of his/her employment, is not liable for an injury caused by the act or omission of another person. 745 ILCS 10/2-204.

**Eleventh Affirmative Defense**

As to the state law claims, punitive damages cannot be awarded for this claim under Illinois law. *Knierim v. Izzo*, 22 Ill. 2d 73 (1961).

**Twelfth Affirmative Defense**

Plaintiff has a duty to mitigate his damages, and any damages awarded to Plaintiff are required to be reduced by any amount by which the damages could have been lessened by Plaintiff taking reasonable action to minimize those damages.

**Thirteenth Affirmative Defense**

Any recovery or award of damages against deceased persons, including Ernest Halvorsen, are limited by Illinois law. 735 ILCS 5/13-209(b)(2).

**Fourteenth Affirmative Defense**

Plaintiff's "Willful and Wanton Conduct" claim is barred because there is no separate and independent tort of "willful and wanton" misconduct. *Jane Doe-3 v. McLean Cnty. Unit Dist. No. 5 Bd. of Directors*, 2012 IL 112479, ¶ 19 (holding that in Illinois, there is no separate, independent tort of willful and wanton conduct); *Krywin v. Chicago Transit Auth.*, 238 Ill. 2d 215, 235 (2010) (same); *Ziarko v. Soo Line R. Co.*, 161 Ill. 2d 267, 274 (1994) (same).

**JURY DEMAND**

Defendants Cline and Mingey hereby demand a trial by jury.

Date: August 6, 2026

Respectfully submitted,

/s/ Carl M. Johnson
CARL M. JOHNSON, Atty No. 6317661
Special Assistant Corporation Counsel
*One of the Attorneys for Defendants Philip J. Cline and Edward Mingey*

James G. Sotos
Josh M. Engquist
Jeffrey R. Kivetz
Jeffrey C. Grossich
Carl M. Johnson
Special Assistant Corporation Counsel
THE SOTOS LAW FIRM, P.C.
141 W. Jackson Blvd., Suite 1240A
Chicago, IL 60604
Tel: (630) 735-3300
cjohnson@jsotoslaw.com